**KIRBY FOREST INDUSTRIES, INC., Appellant,**

v.

**Jackie Glynn KIRKLAND, Appellee.**

**No. A14–87–00835–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

May 18, 1989.

Rehearing Denied June 22, 1989.

Mitchell A. Toups, Beaumont, Houston, for appellant.

Dana G. Kirk, Don M. Kennedy, Houston, for appellee.

## OPINION

### J. CURTISS BROWN, Chief Justice.

This is an appeal from a judgment awarding damages in a personal injury suit. Appellee Jackie Kirkland was cutting timber on land belonging to appellant Kirby Forest Industries, Inc. when he was struck by a falling tree and rendered a paraplegic. Kirby had contracted with K & E Wood Company to cut the wood, and K & E, in turn, had employed Kirkland as a woodcutter. Kirkland sued Kirby and was awarded damages in a jury trial. On appeal Kirby challenges the jury's findings on right of control, negligence and employee versus independent contractor status. Kirby also alleges jury misconduct and complains of the trial court's failure to grant a summary judgment. We affirm the judgment of the trial court.

Kirby's first two points of error concern Special Issue No. 1, which asked the following:

Do you find from a preponderance of the evidence that Kirby Forest Industries, Inc. had the right to control any part of the work of the woodcutters on the occasion in question?

*Instruction:* The "right to control" must be more than a general right to order the work to start or stop, to inspect progress or to receive reports.

Kirby argues that the trial court erred in submitting the issue because it was not supported by any evidence and, further, that the jury's affirmative answer was against the overwhelming weight of the evidence.

An owner or leaseholder is generally not obligated to require an independent contractor to perform an on-premises activity in a safe manner. *Exxon Corp. v. Quinn,* 726 S.W.2d 17, 19 (Tex.1987), citing *Redinger v. Living, Inc.,* 689 S.W.2d 415, 418 (Tex.1985). However, Texas has adopted section 414 of the Restatement (Second) of Torts, which states that one who exercises some control over the independent contractor's work may be liable if he fails to exercise that control with reasonable care. *Redinger,* 689 S.W.2d at 418; Restatement (Second) of Torts § 414 (1965). The degree of control is less than would subject one to liability as a master; however, it is more than a general right to order the work to start or stop, to inspect its progress or to receive reports, to make suggestions or recommendations which need not be followed, or to prescribe alterations and deviations. Restatement, comments a and c; *Redinger,* 689 S.W.2d at 418. If one retains the power to direct the order in which the work is to be done or to forbid its being done in a dangerous manner, he may be subject to liability under this section. Restatement, comment a.

The supreme court recently addressed the right of control issue in *Pollard v. Missouri Pacific R.R.* and stated:

In *Newspapers Inc. v. Love,* 380 S.W.2d 582 (Tex.1964), this court held that if a right of control over the work has a contractual basis, the fact that no actual control was exercised will not absolve a premises owner of liability. It is the right of control, and not the actual exercise of control, which gives rise to a duty to see that an independent contractor performs work in a safe manner. *Id.*

759 S.W.2d 670, 671 (Tex.1988). In *Pollard,* a summary judgment case, an employee of an independent contractor was injured while removing certain poles and

wires from one of MOPAC's right of ways. The court found that MOPAC contractually retained (1) control over the completion time of the contract, (2) authority to specify the poles to be removed, (3) authority to specify insurance coverage and (4) control over access and storage of materials involving MOPAC's right of way. The court held that MOPAC's contractual retention of control gave rise to the duty expressly adopted in *Redinger.* The existence of this duty thus raised a genuine issue of material fact concerning MOPAC's negligence. Kirby's contract here gives it even more right of control than the contract in *Pollard.*

■ With this background, we return to Kirby's first two points of error. In reviewing a "no evidence" point, an appellate court must consider only that evidence and reasonable inferences drawn therefrom in their most favorable light to support the jury's findings, disregarding all contrary evidence and inferences. *King v. Bauer,* 688 S.W.2d 845, 846 (Tex.1985). In reviewing a "sufficiency" point, the court must consider and weigh all of the evidence, both that in support of and that contrary to the finding, and set it aside only if it is so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

■ Kirby argues that the only evidence in the record pertaining to the right to control is that Kirby retained a general right to inspect K & E's progress to ensure that K & E was meeting contract specifications. Kirby maintains those specifications required only that K & E obtain maximum utilization of the wood. Kirby denies that it controlled or had the right to control K & E's woodcutters and states that the contract between the two companies is clear in this regard. Kirby cites the following contractual language in support of its argument:

> Kirby will have no right to direct the means or methods of performance by Contractor; Contractor is to have responsibility for accomplishing the agreed results, himself employing, controlling and directing the details of performance of the work and selecting, directing and controlling his own employees.

Appellee Kirkland claims, however, that by requiring maximum utilization of the wood, Kirby controlled the critical part of the woodcutters' work, the method of cutting the trees. Kirkland notes that the specifications required that butts of the tree and log cuts be "square and smooth without splinters, splits or crushed fibers." This may reasonably be construed to mean that the tree must be sawed flat across with a smooth cut. The use of a smooth cut is dangerous because the direction of the tree's fall cannot be controlled and because the tree possibly may remain standing. Kirby had the ability to forbid the smooth cut simply by changing its contract specifications, and this ability is precisely the type and degree of control that gives rise to the *Redinger* exception. Kirby also had the right to select the harvest areas, to control when and where the woodcutters worked and to designate the specific trees to be cut.

The jury agreed with Kirkland, finding that Kirby retained the right of control over the work of Kirkland and his fellow woodcutters to subject the company to liability under section 414. We sustain this finding as our review of the testimony clearly shows some evidence Kirby had both a contractual and an actual right to control the woodcutters' work at the time of the accident. A question of fact for jury determination was thus presented.

■ The logging contract and supplements set out the terms of the agreement between the two companies. In the contract, Kirby specified the date of completion and also reserved the right to designate "the logging sets, logging trails and other roads" to be used. Section two of the contract specified the actual logging services, and therein Kirby retained the right to designate the area and the trees to be cut.

A. DESIGNATED TREES: On *Selectively Cut Areas:* All trees marked and designated for cutting; on *Clear Cut Areas* or on *Diameter Cut Areas:* All unmarked trees of certain size designat-

ed for cutting as specified on supplement to this agreement, and according to current rules published by Kirby, within designated boundaries and on area outlined on a map on file in the office of Manager–Harvesting, Kirby Forest Industries, Inc., Silsbee, Texas.

Kirby also reserved the *right to change* the contract and the specifications as evidenced by the following excerpts:

E.   Additional Supplements:

As the parties may agree upon additional or changed services to be performed, they will execute additional supplement or supplements to this agreement showing the services to be performed and the payments to be made therefor.   Such supplement or supplements and this agreement shall thereupon be considered together, and together will be the agreement of the parties respecting such additional services. Should Contractor undertake by verbal agreement to perform additional services before written supplement covering same is executed, all terms hereof will apply to such undertaking; and written supplement covering such services will be executed by the parties as soon as practicable.   (Contract)

Specifications may be further explained or amended *as necessary by Kirby's representatives.*   (Specifications) (emphasis added)

Kirby's contractual retention of control closely parallels that discussed in *Pollard.* In addition to the contract, the testimony concerning Kirby's actual exercise of control is instructive.   John Derkits, Kirby's harvesting manager at the time of the accident, testified that the company's forest management people scheduled the property to be harvested at a particular time and that the company could designate the specific trees to be cut.   As for Kirby's actual control in the field, there was testimony, particularly from the Kirby employees, that Kirby did not supervise the logging operation "in any form or fashion."   However, Derkits described the Kirby contract administrator as one who *"supervised the logging contractors' operations*—not supervise, but administered the contract." Harold Keith Axelson, a Kirby logging superintendent, stated that the contract administrator "was assigned by me tracts of timber to cut, varied, with varied products on them, and his job was to harvest those tracts of timber with the three independent contractors that he had."   Raymond Kervin, Jr., son of one of the K & E owners who also was employed by K & E to skid logs, answered affirmatively when asked if he had seen the Kirby woods boss come behind the woodcutters to check that the trees were actually taken out the way Kirby wanted.

Jesse Henson, who was cutting wood with Jackie Kirkland on the day of the accident, testified that the "big boss" in the field was the Kirby man and that "[o]ur boss has got to please him, and we've got to please him."   Furthermore, the woodcutters were subject to a "butt chewing" from their K & E boss if the Kirby wood foreman found they were cutting too high or not going far up enough in the tops.   Vernon Cain, a skidder employed by K & E, testified that the wood foreman came around two or three times a week.   "[H]e was the man the contractor had to work for.   He come out and told you how to cut logs."   Finally, Jackie Kirkland testified as follows:

Q.   Based on your experience, Mr. Kirkland, you worked out there and you saw the Kirby woods boss work; right?

A.   Right, yes.

Q.   And based upon what you saw, what did he do?

A.   He checked behind us to make sure we were doing our jobs right.

Q.   Would that include supervising the cutting of logs?

A.   Yes.

Q.   If you didn't cut it the way they wanted it cut, what happened?

A.   You had to do it over, plus you got eaten out.

There is also the issue of the smooth cut. The following language in section two described how the logging services, felling,

bucking, limbing and topping, should be done.

B. FELLING, BUCKING, LIMBING and TOPPING *shall be done with the objective of recovering the maximum wood volume without waste* (emphasis added); to wit:

(1) Stumps shall be cut low, just at the top of the root swell, or to other heights as specified in current log cutting rules published by Kirby.

(2) Butts of the tree shall be square and smooth without splinters, splits, or crushed fibers.

(3) Charred wood and oversize wood are unacceptable and must be eliminated by "jump butting" out the portion of the tree containing such material.

(4) Recovery of the wood in the main and secondary stems of the tree shall be to its full utilizable length and merchantable diameter and to variable lengths and to variable diameters as required by current rules published by Kirby.

(5) To produce specific lengths with specific trimming allowances according to current rules published by Kirby.

(6) Limbs will be cut close to and parallel to the axis of the main stem.

(7) Log cuts shall be square, smooth and without splintering, splits or crushed fibers.

A revision or supplement issued in October 1985 specifies that "stump heights shall not exceed 6″ for stumps less than 12″ in diameter, or one-half the diameter for those stumps larger than 12″ in diameter." Furthermore, "stumps should not be cut on a slant, and high step joints should be avoided."

Several witnesses testified that Kirby encouraged the use of the smooth cut. Vernon Cain declared that "Kirby wants them sawed smooth. You cut in and then you cut the other way and meet up with your same—what we called match sawing." Rodney Rhodes, a third woodcutter at the scene, agreed that they were told to cut the stumps smooth. Jackie Kirkland testified that although a step cut was the safest cut, Kirby wanted the trees cut flat. Pictures of the tree that fell on Kirkland were introduced into evidence, and no one disputed that the stump appeared to have been smooth or flat cut. Keith Axelson testified that while Kirby does not specify how contract woodcutters should cut a trée, it does specify the use of the back cut, a safer one, in guidelines for *Kirby* woodcutters. The evidence supports the inference that the smooth cut was encouraged, the bottom line being maximum utilization of the wood. Kirby had the power to address the issue in the contract and to forbid the work being done in a dangerous manner.

Given Kirby's contractual retention of control and its actual exercise of control in the field, the jury finding that Kirby retained a sufficient right of control over the work to give rise to the *Redinger* exception is supported. Points of error one and two are thus overruled.

Section 414 states that if one exercises some control over the work of an independent contractor, then he may be liable if he fails to exercise that control with reasonable care. The jury was therefore asked to find whether Kirby had acted negligently and whether such negligence was a proximate cause of the accident. In response to Special Issue No. 2(b), the jury found negligence and proximate cause in Kirby's failure to provide for proper safety rules and procedures for the cutting and felling of trees. In points of error three and four, Kirby maintains that the trial court erred in submitting the issue because it was not supported by any evidence and, further, that the jury's answer was against the overwhelming weight of the evidence.

■ Kirby premises its argument on its assertion that it retained no right of control over the independent contractor and therefore could assume the contractor would perform its responsibilities in a safe and workmanlike manner, taking proper care and precautions to ensure the safety of its employees. However, we have already found sufficient contractual and actual right of control to give rise to a duty. The issue is thus evidence of the negligent exercise of that control.

We have already shown that Kirby made no provisions in the contract for the use of a safer cut. Furthermore, the company left all safety considerations to K & E. While Kirby had safety rules for its *own* employees, it had none regarding the harvesting done by its independent contractors and did not know whether K & E had its own safety program. As articulated by Mr. Derkits, Kirby's philosophy was that "the people we sell plywood to don't tell us how to run our safety program in the plywood plant. We don't tell the independent contractor how to run his safety program in the logging operation."

Also, those Kirby employees who went out to the property to verify that the contract specifications were being met were not expected to check for or to report dangerous conditions, even though they were usually the last persons through the area. We take particular note of this policy because in this case the K & E crew had been sent back to recut the acreage involved. The greater danger this presents was described by one witness. "You got limbs and things that can be hanging that you break that don't fall out. You have to go back through and watch. Them limbs and stuff might fall." In this case, a tree fell.

The evidence suggests that Kirby attempted to insulate itself from liability as to the independent woodcutters; however, given the duty that the jury found and we have affirmed, the failure to provide safety rules and procedures offered ample basis for the jury verdict.

■ Kirby next argues that this failure was not a proximate cause of the accident. However, the evidence justified the jury's conclusion that had Kirby instituted certain safety procedures the accident could have been avoided. The requirement of a safer cut would have ensured that the trees that were cut were actually felled and in a controlled manner. Procedures for inspecting cut acreage would have ensured that any trees either caught in other trees or left standing would have been discovered and felled before the woodcutters went back into the area. The log that injured Kirkland would not have been left standing.

The evidence supports the jury's finding of proximate cause, and we overrule points of error three and four.

In response to Special Issue No. 2(e), the jury found Kirby negligent in exercising its control over the woodcutters "in providing in the Kirby Forest Industries, Inc. specifications that trees should be 'smooth cut' rather than 'step cut' so that the tree's fall can be controlled." The jury further found this to be a proximate cause of the accident. In points of error five and six, Kirby challenges the evidentiary basis for the submission of the issue and for the jury's response.

We previously discussed the smooth cut issue in response to points of error one and two. A tree cut with a smooth cut poses a great danger to woodcutters. Kirby had the power to protect against that danger by requiring a safe cut in its specifications as it did for its own employees. While Kirby did not specifically require a smooth cut, the testimony and the specifications indicate that it was encouraged. Obviously, K & E and its woodcutters would do what was expected of them. The woodcutters uniformly testified that they were answerable to the Kirby woods boss and would certainly hear if they did not do the job the way Kirby wanted it done. We find sufficient evidence to support the jury's findings of negligence and proximate cause. Points of error five and six are overruled.

In points of error seven and eight, Kirby objects to Special Issue No. 5, which asked the jury if Kirkland were acting as an independent contractor of K & E rather than as an employee at the time of the accident. The jury found that Kirkland was not acting as an independent contractor. Kirby asserts that in his Second Amended Petition, Kirkland judicially admitted he was an independent lumberjack or log cutter. Kirby therefore argues that this judicial admission, as well as the total absence of evidence that Kirkland was an employee of K & E, indicates the trial court erred in submitting Special Issue No. 5. Kirby also argues the trial court erred in not granting Kirby a new trial because the

jury's finding is so clearly against the great weight and preponderance of the evidence as to be manifestly wrong and unjust.

■ In its objection to Special Issue No. 5, Kirby stated only that the trial court should find as a matter of law that Kirkland was an independent contractor of K & E Wood Company and that this was not an issue in dispute. Kirby did not object to the issue on the ground that Kirkland's status had been judicially admitted. Therefore, Kirby has not properly presented this contention on appeal. *Castleberry v. Branscum,* 721 S.W.2d 270, 276 (Tex.1986); Tex.R.Civ.P. 274.

■ Furthermore, the statement labeled a judicial admission read thusly: "On or about January 29, 1986, Plaintiff Jackie Glynn Kirkland was performing services as an independent lumberjack or log cutter on land in Liberty County, Texas, owned and controlled by Defendant Kirby Forest Industries, Inc." Before a pleading may be deemed a judicial admission, it must be deliberate, clear and unequivocal. *American Casualty Co. of Reading, Pennsylvania v. Conn,* 741 S.W.2d 536, 539 (Tex.App. —Austin 1987, no writ). The petition was filed in a suit against Kirby, and the statement is subject to the construction that Kirkland was referring to his relationship to Kirby, not to K & E. We therefore do not find this statement sufficiently clear so as to bind Kirkland. Finally, Kirby waived error by not filing special exceptions pointing out any defects in the petition. *Hennigan v. Harris County,* 593 S.W.2d 380, 383 (Tex.Civ.App.—Waco 1979, writ ref'd n.r. e.); Tex.R.Civ.P. 90, 91.

■ Kirby's second argument, that the jury's finding concerning Kirkland's status is against the great weight and preponderance of the evidence, is also not persuasive. Kirby argues that the submission of the issue and the jury's finding were prejudicial because, based on the answer to Special Issue No. 5, the jury was not able to reach a subsequent issue on comparative negligence.

The trial court defined "independent contractor" and "employee" in these words:

"Independent Contractor" means a person who, in the pursuit of an independent business, undertakes to do specific work for another person, using his own means and methods without submitting himself to the control of such other person with respect to the details of the work, and who represents the will of such other person only as to the result of his work and not as to the means by which it is accomplished.

"Employee" means a person in the service of another with an understanding, express or implied, that such other person has the right to direct the details of the work and not merely the result to be accomplished.

Kirby did not object to this wording. As a result, the jury had to consider the evidence in light of these definitions, and, once again, the evidence created a question of fact for the jury's determination.

There was testimony that Kirkland was self-employed and paid his own income tax and social security. However, Kirkland also testified that he had been "employed" by K & E for seven to eight months prior to the accident. Furthermore, the testimony indicated that, in addition to the result to be accomplished, the K & E bosses had input into the details of the work. When the Kirby woods boss came out and complained about the woodcutters' work or gave instructions about where to cut, it was the K & E boss who relayed the messages. K & E also established certain procedures the woodcutters were to follow such as what to do if a cut tree lodged in another tree. Given the trial court's definitions of independent contractor and employee, we hold that the jury's finding was not against the overwhelming weight of the evidence. Points of error seven and eight are overruled.

Kirby next complains that the trial court improperly denied Kirby's motion for new trial because of jury misconduct. Kirby contends that the affidavit of juror Counsellor establishes that outside influences were improperly brought to bear upon the

jurors in this case. Specifically, those outside influences were a discussion of attorney's fees by jurors, which resulted in a substantial increase in damages, and pressure from employers to return to work, which resulted in two jurors changing their votes.

Under the jury misconduct rules, TEX.R. CIV.EVID. 606(b) and TEX.R.CIV.P. 327, all testimony, affidavits and other evidence is excluded from consideration by the court when a claim of jury misconduct is raised unless it is shown that an "outside influence was improperly brought to bear upon any juror." *Robinson Elec. Supply Co. v. Cadillac Cable Corp.*, 706 S.W.2d 130, 132 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.). "Outside influence" is not defined by the rules; however, case law has construed the term such that an outside influence must emanate from outside the jury and its deliberations. *Clancy v. Zale Corp.*, 705 S.W.2d 820, 829 (Tex.App.—Dallas 1986, writ ref'd n.r.e.). Put another way, it must come from a source other than the jurors themselves. *Robinson Elec. Supply*, 706 S.W.2d at 132.

■ Clearly, the alleged misconduct concerning discussions about attorney's fees does not meet the courts' interpretation of "outside influence." Kirby argues, however, that this court should be guided by TEX.R.CIV.P. 226a in determining what constitutes an outside influence. The instructions to the jury in Rule 226a contain the trial court's admonishment not to consider certain evidence in rendering a verdict. Kirby would argue that if the jury considers anything in violation of these instructions, then this court should determine that an outside influence has been improperly brought to bear upon the jurors.

When it amended the jury misconduct rules in 1983 and 1984, the Texas Supreme Court chose to adopt a stringent "outside influence" test with the goal of insulating most of the jury deliberation process from scrutiny. *See Robinson Elec. Supply*, 706 S.W.2d at 132–33. We are bound by those rules and we therefore decline to adopt Kirby's argument.

■ Concerning the pressure from employers to return to work, this seems to be an unfortunate aspect of the jury system about which little can be done. There are always pressures not only from employers but also family, recreation and personal preferences of jurors. We do not consider these normal pressures to be an outside influence within the meaning of the rules. Were they to be considered an outside influence, few verdicts would stand. Finally, we note that Mrs. Counsellor's affidavit is contradicted by an earlier one signed by her stating that no outside influence was improperly brought to bear upon her or any other juror. Point of error nine is overruled.

In point of error ten, Kirby claims that the trial court improperly denied Kirby's motion for summary judgment because there was no evidence that Kirby was liable under any theory of premises owner liability. An order overruling a motion for summary judgment is not subject to review upon appeal. *Ackermann v. Vordenbaum*, 403 S.W.2d 362, 365 (Tex.1966); *Huffines v. Swor Sand & Gravel Co.*, 750 S.W.2d 38, 41 (Tex.App.—Fort Worth 1988, no writ). Point of error ten is thus overruled.

We affirm the judgment of the trial court.

ROBERTSON, Justice, dissenting.

I cannot agree that there is any evidence that appellant had any right of control of any of the work of the woodcutters; therefore I respectfully dissent.

The first two issues submitted to the jury, and the responses thereto were:

SPECIAL ISSUE NO. 1

Do you find from a preponderance of the evidence that Kirby Forest Industries, Inc., had the right to control any part of the work of the woodcutters on the occasion in question?

Answer: "We do" or "We do not."

ANSWER: We do.

*Instruction:* The "right to control" must be more than a general right to order the

work to start or stop, to inspect progress or to receive reports.

If you have answered Special Issue No. 1 "We do" and only in that event, then answer Special Issue No. 2 ; otherwise, do not answer Special Issue No. 2 .

## SPECIAL ISSUE NO. 2

Do you find from a preponderance of the evidence that Kirby Forest Industries, Inc. was negligent in exercising such control over the work of the woodcutters on the occasion in question in any of the following particulars? Answer "Yes" or "No" on each line in Column 1. If any of your answers in Column 1 are "Yes", was any such negligence a proximate cause of the occurrence in question? Answer "Yes" or "No" on the corresponding line of Column 2.

|  | Column 1 Negligence | Column 2 Proximate Cause |
|---|---|---|
| a. In sending the woodcutters back into an area which had already been cut without performing a reasonable inspection to determine if there were lodged or standing trees that had been cut but not felled. | Yes | No |
| b. In failing to provide for proper safety rules and procedures for the cutting and felling of trees. | Yes | Yes |
| c. In failing to warn Jackie Glynn Kirkland of the danger of lodged or standing trees that had been cut but not felled. | No | + |
| d. In failing to provide properly trained and experienced Kirby Forest Industries, Inc. personnel to supervise the woodcutters work on Kirby Forest Industries, Inc.'s property. | No | − |
| e. In providing in the Kirby Forest Industries, Inc.'s specifications that trees should be "smooth cut" rather than "step cut" so that the tree's fall can be controlled. | Yes | Yes |

In its first two points of error appellant contends the trial court erred in submitting the first issue because it is not supported by any evidence, or alternatively, that the jury's answer is against the overwhelming weight of the evidence. In its next two points of error appellant contends the trial court erred in submitting issue 2(b) because it is not supported by any evidence, or, alternatively, that the jury's answer is against the overwhelming weight of the evidence. In its next two points of error appellant contends the trial court erred in submitting issue 2(e) because it is not supported by any evidence, or, alternatively, that the jury's answer is against the overwhelming weight of the evidence. All these points are so closely related that the law points (1, 3, and 5) will be jointly discussed as will fact points (2, 4 and 6).

Appellee referred to himself as an expert woodcutter, working as an independent contractor, cutting logs for K & E Company, a logging contractor. Appellant, Kirby Forest Industries, owned approximately 650,000 acres of timber land in Texas and Louisiana. K & E had been contracting exclusively with Kirby for some 8 to 10 years to harvest timber for Kirby. Contracts were entered into from time to time covering specific tracts of land. The contract, number 450, in effect at the time of appellee's injury was executed on December 31, 1979, and was supplemented in writing from time to time to cover specific

tracts of land and specific types and sizes of timber to be harvested, dependent upon the use for the harvested timber, i.e. scaled logs, plywood logs, sawmill logs, or pulpwood. At the time of appellee's injury, K & E was working under supplements to the contract that called for "clear cutting" an area containing some 22 acres. The loggers had already cut and removed the pine timber and were in the process of cutting and removing the hardwood when a hardwood tree, which had been cut almost totally through, fell on appellee as he was in the process of cutting limbs from another tree he had just felled. Appellee suffered extensive and very serious injuries.

The first paragraph of the contract between Kirby and K & E provided:

> Contractor will, with his own equipment and employees, and upon his own responsibility and risk, perform logging services for Kirby and will be paid for such services, all as stated on Supplement 1 hereto and on additional supplements which may be agreed upon from time to time. Kirby will have no right to direct the means or methods of performance by Contractor; Contractor is to have responsibility for accomplishing the agreed results, himself employing, controlling and directing the details of performance of the work and selecting, directing and controlling his own employees.

The concluding paragraph of the contract provided:

> Contractor is familiar with all applicable safety rules, and rules currently published by Kirby relating to log and product specifications, particularly regarding tree and log sizes, trim allowance, log lengths, and defects. Contractor will keep himself informed of these specifications unless Contractor, upon a change, gives notice of the termination of his contract.

The majority points to the following provisions of the contract and the supplements thereto to justify the conclusion of Kirby's contractual retention of control: (1) specification of the date for completion of the harvest contracted for (each supplement to the contract provided that "Kirby may terminate the agreement as applicable to the services herein contemplated if the same are not completed by contractor by _____."); (2) reservation of the right to designate "the logging sets, logging trails and other roads" to be used (the main contract provided that "Road use, construction and hauling shall be done in such manner as to do the minimum damage to the remaining forest and environment, and to any improvements, particularly to road surfaces, ditches, culverts, bridges, fences and gates ..."); (3) reservation of right to designate area from which trees were to be harvested and the size and kind of trees to be harvested; (4) reservation of the right to change the contract; (5) reservation of the right to add additional supplements *"as the parties may agree* upon additional or changed services to be performed" (quoted at length in the majority opinion); and (6) the testimony that Kirby "scheduled the property to be harvested at a particular time and that the company could designate the specific trees to be cut." It is interesting to note that appellee does not argue that any of the above circumstances, except numbers (3) and (5) amount to a right to control the work of the woodcutters.

The bottom line, so far as I can determine, of the majority opinion is that because Kirby desired maximum utilization of the natural resource—the timber—Kirby thereby controlled the method of cutting the trees; therefore, the tree must be cut with a smooth cut and the smooth cut is dangerous. Also, Kirby had the power to address in the contract the manner in which the trees were to be cut and to forbid the trees being cut in a dangerous manner, and by not doing so it subjected itself to potential liability. I disagree because the facts upon which the majority relies do not rise to the level of a right to control *any* part of the work of the woodcutters.

The first issue inquired whether Kirby had the right of control over the work of the woodcutters; the jury found it did. In answer to the second issue, the jury found Kirby was negligent in exercising control over the work of the woodcutters in two

respects: (1) in failing to provide for proper safety rules and procedures for cutting and felling trees, and (2) in providing in the Kirby Forest Industries, Inc.'s specifications that trees should be "smooth cut" rather than "step cut." As a general proposition, an owner is not obligated to require an independent contractor to perform on-premises activity in a safe manner. *Exxon Corp. v. Quinn*, 726 S.W.2d 17 (Tex.1987). An exception was carved out in *Redinger v. Living, Inc.*, 689 S.W.2d 415 (Tex.1985), which provides that when one exercises some control over an independent contractor's work he may be liable unless he exercises reasonable care in supervising the contractor's activity. Furthermore, in *Pollard v. Missouri Pacific R.R.*, 759 S.W.2d 670 (Tex.1988) and in *Newspapers Inc. v. Love*, 689 S.W.2d 582 (Tex.1964), the Texas supreme court held that a premises owner may be liable for failure to exercise reasonable care where he has a contractual right of control, even if he does not exercise that right. In this case then, if appellant had a right of control over the woodcutters then it owed them a duty to provide them with training or instruction in safely cutting trees.

Reviewing the evidence in the light most favorable to the verdict, without regard to contradictory evidence or inferences, the record reveals the following. Kirby Forest Industries owned the land on which the plaintiff was working. Plaintiff was paid by K & E who had a contract with Kirby. The contract gave Kirby the right to designate which trees were to be cut, and to require maximum utilization of the wood. Specifically the contract stated that stumps should be cut low, stumps should not be cut on a slant or with high step joints, and butts of logs should be cut square and smooth. As the majority concedes, however, Kirby did not specify that a smooth cut be used, and the contract gave them no control over the means or methods of the cutters.

Additionally, Kirby did not supply any equipment to the woodcutters or to K & E and Kirby did not supervise, train or instruct the woodcutters to insure that they cut trees safely. A Kirby employee, called a contract administrator, would visit the cutting area once or twice a week solely to determine if the woodcutters were adhering to contract specifications and to designate other areas for cutting. The woodcutters were paid by K & E and the Kirby contract administrator always spoke with the partners of K & E if he was displeased with the logs. Under these facts, it appears the only right of control given to Kirby was the right to designate what trees were to be cut, to specify that there be maximum utilization of the wood, that stumps be cut low and without high step joints, and that butts of logs be smooth and square.

Appellee contends that these contract specifications amounted to the *right to control* the work of the woodcutters. First, he argues, that the right to designate what trees are to be cut retains in Kirby a right of control over the woodcutters. It is difficult to determine from the majority opinion the extent to which it relies upon the right to designate what trees are to be cut as a retention of the right of control over the woodcutters. Assuming the majority finds this to be a retention of the right of control, then I disagree, because in my opinion, this contract specification just cannot be said to be an exercise over the independent contractor's *work*. To hold otherwise would mean that the exception created by *Redinger* would become the rule. Second, appellee argues, and the majority agrees, that the right to specify that there be maximum utilization of the wood, that the stumps be cut low and without high step joints and that butts of logs be smooth and square amounted to the *right to control* the work of the woodcutters by necessitating the use of an unsafe means of cutting—the smooth or flat cut. Therefore, it is our duty, under appellant's challenge, to determine if there is *any* evidence to support the jury finding that Kirby Forest Industries, Inc.'s specifications required that trees should be smooth cut rather than step cut. I can find none.

First, of course, the specifications of the contract do not so provide. This should end the inquiry based upon the wording of

appellee's issue. However, the majority looks to the testimony of (1) fellow woodcutters Jesse Henson and Rodney Rhodes, (2) Vernon Cain, an employee of K & E, who operated a skidder to bring the logs from where the trees were cut to the truck loading area, (3) appellee and (4) Keith Axelson, a Kirby logging supervisor to find this requirement. I do not understand how their testimony can control the specific terms of the contract, but even if it could, such evidence amounts to no more than a scintilla and therefore, fails under appellant's challenge.

Looking to the testimony of each and the reasonable inferences flowing therefrom in their most favorable light to support the jury's findings, and disregarding all contrary evidence, I find the following.

Henson, one of the three woodcutters, testified by deposition. Only the following questions were asked, and answers given, which relate to the issue:

Q. As far as you know from your own personal knowledge, was Kirby providing any equipment out there on that job?

A. Butt chewing.

Q. What is butt chewing?

A. That's when you get your butt chewed out.

. . . .

Q. Let me get back to the butt chewing. The Kirby man out there is called a woods boss. Is that right?

A. Right.

. . . .

A. Our boss has got to please him, and we've got to please him.

. . . .

Q. How many times a week would you say that he'd come out to see what was going on the survey?

A. Once or twice. Sometimes he wouldn't. Depends on how the job was going.

. . . .

Q. You tell me what you meant by butt chewing. I'm not going to put words in your mouth. You tell me about it.

A. If you're messing up, if you're cutting too high or something, if you're not

going far enough up in the tops, the wood foreman comes out there and tells our boss; and they come out and tell us. Rhodes, the second of the woodcutters, also testified by deposition.

The only questions and answers relating to the issue were:

Q. Is the Kirby woods boss the head man on the survey?

A. Yes.

Q. Does everybody at K & E take orders from the Kirby woods boss?

A. Yes, I reckon.

Q. Did the woods boss on this particular survey give anybody any orders about safety, about how you ought to work?

A. No.

Q. Did they provide you any safety manuals or anything like that?

A. No.

Q. Did Kirby have any safety meetings for the woodcutters to tell them how to do it safely?

A. No.

Q. Did Kirby provide specifications for cutting wood?

A. No.

Q. In terms of how high the stumps were supposed to be?

A. Yes, on that.

Q. In those specifications, did they provide that the stumps were supposed to be cut smooth?

A. Yes.

Q. That was the way you were doing it, right, smooth? Were you told to cut them smooth?

A. Right.

. . . .

Q. Look at those two pictures. For the record, we're looking at Plaintiff's Exhibit 2 and Plaintiff's Exhibit 5, looking at those two, is that a flat cut?

A. Yes, straight out.

Q. There's another way to cut trees to make them a little bit more controllable about which direction they fall, and that's called an offset?

A. Yes, cut on both sides. That tree was back handed probably. You couldn't

really tell. That's probably the way it was cut.

Appellee testified that he was an expert woodcutter, "better than most," and acknowledged that "it didn't take Bob Harper (Kirby representative) to come out there and teach [me] how to cut a tree because [I] already knew." Concerning the issue of a "smooth cut," he testified:

Q. You've heard us talking during the course of this trial about step cut or offset cutting.

A. Yes, sir.

Q. In your opinion is that the safest way to cut a tree?

A. Yes, sir.

Q. When you're working on Kirby land under their specifications, would they let you cut it that way?

A. They didn't like for you to.

Q. How did they want you to cut it?

A. They wanted you to cut it flat.

Cain, a skidder operator, testified by deposition. While he was not a woodcutter, he nevertheless testified about the issue of a smooth cut as follows:

Q. Let me put it this way: How were you instructed by Kirby to cut those stumps?

A. We back sawed them.

Q. Like this?

A. Kirby wants them sawed smooth. You cut in and then you cut the other way and meet up with your same—what we called match sawing.

Q. Did they instruct you to do a flat cut?

A. They wanted it as flat as you could get it.

.  .  .  .

Q. When he [the Kirby wood boss] come out to the job site, did the contractors do what he said to do?

A. They was working for Kirby, so they had to do what Kirby wanted them to haul.

Q. Kirby was the final authority to say how they wanted it cut and where they wanted it cut?

A. Sure, you got to cut your stumps down right and you got to cut your log length and you had to go in the top and get all the wood out. Kirby wanted you to cut your logs, cut them right and cut what they spotted. If it was clear cut, if you had any left, you had to go back and cut them. That's the way the operation went always all my life.

Q. Not only on this job with Kirby but on other jobs that you've worked on over the years?

A. They want to make sure their logs are cut to their specifications.

Finally the majority refers to the testimony of Axelson, a Kirby logging supervisor. He testified by deposition, and those portions introduced by appellee showed that cutting trees is dangerous because to "harvest a tree means more than cut." He stated that Kirby does not prescribe or dictate any safety regulations to its contractors. Concerning the testimony attributed to him by the majority, he explained in answer to questions by appellee's counsel, how he would cut a tree—that is cutting a third of the way through on one side and then cutting from the opposite side "a little higher" and "unless the wind's blowing real hard or there's some other factor, generally speaking, that tree's going to fall to the side of the lower cut." The following then occurred:

Q. Does Kirby Forest Products ever specify this technique that you've just described or any other safe way to cut a tree so that the forester will know which way the tree is going to fall?

A. Specify to whom?

Q. To the woodcutters.

A. No. To a company, or to contract woodcutters?

Q. Either one.

A. Yes.

Q. To the company woodcutters, it does?

A. They are written—I don't know if you call it policy, procedure, practices regarding the felling of trees for company individuals.

.  .  .  .

Q. Anything else that you can remember in those regulations?

A. No. It has been years since I read those.

He continued his testimony that those regulations were "incorporated into a safety manual, a green, bound safety manual of all safety procedures and guidelines." (However, to put this testimony in proper perspective John Derkits, the project forester for Kirby, and called as a witness by appellee, had just testified prior to the introduction of the deposition, that in the past they (Kirby) had salvage crews who cut logs, "but we haven't had those for years." He stated that when they had such salvage crews Kirby had a "little green book," a safety manual that provided safety specifications for company employees.)

This, then, is the testimony which the majority finds to be sufficient to sustain the finding of the jury "that Kirby retained a sufficient degree of control over the contract woodcutters' work to give rise to the *Redinger* exception." I disagree and would hold this is *no evidence* that Kirby retained anything but the right to control the end product of the woodcutters, as opposed to the right to control any part of the woodcutters' work. It necessarily follows, from this proposition, that there is no evidence, in my opinion, to support the jury's answer to issues 1, 2(b) and 2(e). The judgment should be reversed and rendered in favor of appellant.

Next, addressing appellant's points two, four and six, when all of the evidence is considered to address appellant's challenge to the factual sufficiency of the evidence, it is abundantly clear to me that the answers of the jury to issues 1, 2(b) and 2(e) are against the overwhelming weight of the evidence. In addition to that evidence detailed above, the record contains the following.

John Derkits, project forester for appellant, testified that contract administrators, employees of Kirby, were the individuals whose job it was to oversee the contracts with logging contractors. Concerning the contract under which the logging was being done in this case, he testified that the contract administrator showed "K & E the tract of land that they were to cut on and described the timber that the logs would be cut from, what sizes or if it's a clear cut. He didn't show them which tree to cut or where on the tract to go and cut, you know, where to start and what time of day to start or anything ... We don't tell them when or how to cut the trees. We show them where to cut them." He explained that the specifications in the contract that "log cuts shall be square, smooth and without splintering, splits or crushed fibers" means that "the ends of the log is what we're talking about cutting smooth, not how you cut the tree of the stump." As to how to cut down a tree, he testified that Kirby does not have any safety rules because the logger is "the expert. That's an art, cutting down trees. Guys like Jackie Kirkland, that's an art. You just don't go to school and learn how to do it." He stated that the contract contains no specifications on stump characteristics as far as how they should be safely cut. Concerning step joint cuts, he stated "we don't say a step joint should be avoided. We say high step, if its a high step rather than a low step. If you cut a high step, it's a tendency for the tree to split. If you cut it lower, then you don't damage the log as much, and its really safer because the tree won't split up as bad and hold it to the stump and hinge over." He also testified that step cuts were used by the woodcutters because the photograph of the stump of the tree "next to the tree that hit Jackie" had been step cut. Robert Harper, contract administrator for appellant, testified a back cut "would be a cut that's made so you can directionally fell a tree."

Finally, there was no testimony indicating that Kirby's contract specifications, if different, would have prevented this accident. Appellee testified that with all the experience he had in cutting trees, "it didn't take Bob Harper to come out there and teach [me] how to cut a tree because [I] already knew," and that there was not "anything anybody could have told [me] that [I] didn't already know about to be a safe woodcutter." He acknowledged that he was an expert—better than most—on how to do it right. At trial appellee ex-

plained a "match cut" as being a procedure where the woodcutter cuts about a third of the way through a tree and then cuts the reverse side of the tree, lining up the cut so that it matches the first cut thereby leaving a smooth cut, both on the log end and on the stump. While at trial he testified this type cut wasn't "as safe," a portion of his deposition was introduced where he testified that based upon all his years experience as a woodcutter, *it was a safe way to cut a tree* (emphasis supplied). Another portion of his deposition testimony was introduced in which appellee testified that he had never used the technique of a step cut.

Raymond Kervin, one of the owners of K & E, testified appellee was an experienced woodcutter hired by his company. He stated that Kirby never supervised his men, and that Kirby never told his woodcutters how to cut a tree. He stated that appellee and other woodcutters he hired were "some of the best I ever saw" and that we picked the woodcutters—"the ones that we knew how to cut logs." Bernard Edge, the other owner of K & E, testified it was not Kirby's job to tell the woodcutter how to cut a tree. He stated that appellee was "one of the best" woodcutters.

In view of all this evidence, and the lack of any to the contrary, other than the inferences related above, the findings by the jury (1) that Kirby had a right to control any part of the work of the woodcutters, (2) that Kirby was negligent in exercising such control in failing to provide proper safety rules and procedures for cutting and felling trees, and (3) that Kirby was negligent in exercising such control in providing that trees would be smooth cut rather than step cut, are contrary to the overwhelming weight and preponderance of the evidence, and accordingly the judgment should be reversed and remanded. However, having previously determined that in my opinion there is no evidence to support the issues, there is no need to address appellant's seventh and eighth points of error. The judgment should be reversed and rendered in favor of appellant.

PAUL PRESSLER and SEARS, JJ., join in this dissent.

MURPHY, Justice, dissenting.

I agree that from the contract language the jury could reasonably conclude that Kirby retained a sufficient degree of control over the contract woodcutter's work to give rise to the *Redinger* exception. I also believe there is some evidence in the record to support the jury's answer to Special Issue No. 2(b) establishing negligence and such answer was not against the overwhelming weight of this evidence. On the issue of proximate cause, however, I would find the jury's answer to be against the overwhelming weight of the evidence.

Proximate cause encompasses the elements of cause in fact and foreseeability. *Williams v. Steves Indus., Inc.*, 699 S.W.2d 570, 575 (Tex.1985). Cause in fact means that the negligent act at issue (here, failing to provide for proper safety rules and procedures for the cutting and felling of trees) was a substantial factor in producing the injury, and without such negligence no harm would have resulted. *Nixon v. Mr. Property Management Corp.*, 690 S.W.2d 546, 549 (Tex.1985). Foreseeability means that the actor as a person of ordinary intelligence, should have anticipated the danger of his act to others. *Id.* at 549–50. However, foreseeability does not require that the actor foresee the particular accident or injury which in fact occurs. *Trinity River Auth. v. Williams*, 689 S.W.2d 883, 886 (Tex.1985). Nor does foreseeability require that the actor anticipate just how the injury will grow out of a particular dangerous situation. *Clark v. Waggoner*, 452 S.W.2d 437, 440 (Tex.1970). All that is required is that the injury be of such a general character as might reasonably have been anticipated and that the injured party be so situated with relation to the wrongful act that injury might reasonably have been foreseen. *Motsenbocker v. Wyatt*, 369 S.W.2d 319, 323 (Tex.1963).

I will not reiterate the testimony relied upon by Justice Robertson to find there to be no evidence, or that relied upon by the majority to be factually sufficient, but in my view the evidence does not support a finding that failure to provide for proper

safety rules and procedures for the cutting and felling of trees was a substantial factor in producing the injury suffered by appellee or that proper safety rules and procedures would have resulted in no harm to appellee.

I would also sustain points of error five and six. I find there to be no evidence that Kirby's contractual specifications provided that trees be "smooth cut." The specifications did provide that the butts and log ends be cut squarely and smooth. While several witnesses testified that despite the language in the specifications, Kirby encouraged the use of the "smooth cut," that requirement is simply not *in* the specifications.

I agree with the majority in all other respects.