

NUMBER 13-10-00586-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

EDITORIAL CABALLERO, S.A. DE C.V. AND
GRUPO SIETE INTERNATIONAL, INC.,                    Appellants,

v.

PLAYBOY ENTERPRISES, INC.,                          Appellee.

**On appeal from the 332nd District Court
of Hidalgo County, Texas.**

# OPINION

**Before Justices Rodriguez, Vela, and Perkes
Opinion by Justice Rodriguez**

This is a commercial dispute between appellants, Editorial Caballero, S.A. de C.V. (EC) and Grupo Siete International, Inc. (GSI), and appellee, Playboy Enterprises, Inc. (PEI). For over twenty years EC published and distributed a Spanish language version of *Playboy* magazine in Mexico and other Latin American countries. In October 1996,

PEI and EC entered into a licensing agreement (License Agreement) that provided, in relevant part, that EC could publish a Spanish language version of *Playboy* for distribution in the United States. GSI was EC's assignee of the U.S. distribution rights to the Spanish language version of *Playboy*. In January 1998, PEI terminated the License Agreement because EC and GSI allegedly failed to pay certain monies due under the License Agreement and under a Renegotiated Payment Plan Agreement. EC and GSI claimed that PEI caused the failure of the project. Suit was filed. EC and GSI filed claims against PEI, and PEI filed counter-claims against EC and GSI. The case was tried twice to a jury.

Following the first trial, EC and GSI appealed. *See Playboy Enter., Inc. v. Editorial Caballero, S.A. de C.V.*, 202 S.W.3d 250, 276 (Tex. App.—Corpus Christi 2006, pet. denied) (*Playboy I*). In *Playboy I*, this Court rendered judgment against EC and GSI on all claims except breach of contract and fraudulent concealment, remanding those claims for a new trial. *Id.* We also remanded all claims asserted by PEI against EC and GSI. *Id.*

The second trial, the judgment from which this appeal is taken, began on March 31, 2010. Rejecting PEI's argument that our 2006 decision and the law of the case doctrine precluded many of EC and GSI's claims, the trial court submitted EC and GSI's claims against PEI for breach of the License Agreement, common law fraud, statutory fraud, antitrust violations, and theft. In addition, the trial court submitted PEI's claims against EC and GSI for breach of the License Agreement, breach of the Renegotiated Payment Plan Agreement, and fraud. The jury found against EC and GSI on their claims and in favor of PEI on its claims. The trial court entered judgment in favor of PEI and

2

awarded breach-of-contract damages in the amount of $410,000.[1]  It also awarded

$1,680,000 in attorneys' fees, $500,000 in conditional appellate attorneys' fees, and

interest.   Following the entry of judgment in PEI's favor and the denial of EC and GSI's

post-judgment motions, EC and GSI appealed.

By three issues, with multiple sub-issues, EC and GSI contend that (1) they are

entitled to a new trial based on jury misconduct; and (2-3) the evidence is insufficient to

support the adverse jury findings.   We affirm.

## I.  JURY MISCONDUCT

By their first issue, EC and GSI contend that the trial court abused its discretion

when it denied their motion for new trial based, in part, on allegations of material jury

misconduct that caused injury.   The jury returned a 10-2 verdict.   EC and GSI argue that

the trial court abused its discretion in refusing to (1) admit and rely on affidavits from the

two dissenting jurors; (2) hear live testimony from any of the jurors, especially the two

juror affiants; and (3) grant a new trial based on juror misconduct.   PEI responds that the

juror affidavits did not contain competent, admissible evidence of jury misconduct, and its

objections to those affidavits were properly sustained.   We agree with PEI.

## A.   Standard of Review and Applicable Law

We review a trial court's ruling on a motion for new trial based on jury misconduct

for an abuse of discretion.   *Vela v. Wagner & Brown, Ltd.*, 203 S.W.3d 37, 48 (Tex.

App.—San Antonio 2006, no pet.) (op. on reh'g).   An abuse of discretion will be found

when the trial court's ruling is arbitrary, unreasonable, or without reference to guiding

---

[1] The jury also awarded fraud damages against EC and GSI, but PEI elected to recover on its contract claims instead.

principles. *Goode v. Shoukfeh*, 943 S.W.2d 441, 446 (Tex. 1997).

Whether jury misconduct occurred and caused injury is a question of fact for the trial court. *Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 372 (Tex. 2000). To obtain a new trial based on juror misconduct, an appellant must show (1) the misconduct occurred, (2) it was material, and (3) it probably caused injury. TEX. R. CIV. P. 327; *Golden Eagle Archery*, 24 S.W.3d at 372. A motion for new trial based upon jury misconduct must be supported by a juror's affidavit alleging that outside influences were brought to bear upon the jury. *Weaver v. Westchester Fire Ins. Co.*, 739 S.W.2d 23, 24 (Tex. 1987) (per curiam); *see* TEX. R. CIV. P. 327(b); *see also* TEX. R. EVID. 606(b).

An outside influence "must emanate from outside the jury and its deliberations." *Soliz v. Saenz*, 779 S.W.2d 929, 931-32 (Tex. App.—Corpus Christi 1989, writ denied); *see Golden Eagle Archery*, 24 S.W.3d at 370; *King v. Bauer*, 767 S.W.2d 197, 198 (Tex. App.—Corpus Christi 1989, writ denied). An outside influence does not include "information not in evidence, unknown to the jurors prior to trial, acquired by a juror and communicated to one or more other jurors between the time the jurors received their instructions from the court and the rendition of the verdict" and does not include "[i]nformation gathered by a juror and introduced to the other jurors by that juror, even if the information were introduced specifically to prejudice the vote . . . ." *Soliz*, 779 S.W.2d at 932; *see, e.g., King*, 767 S.W.2d at 198 (holding that "discussion of newspaper articles is not considered an outside influence"). In sum, under this rule, a juror may testify about "improper contacts with individuals outside the jury" or "matters or statements not occurring during the course of the jury's deliberations." *Golden Eagle Archery*, 24 S.W.3d at 370. However, "[a] juror may not testify as to any matter or

4

statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict concerning his mental processes in connection therewith, . . . ." TEX. R. CIV. P. 327(b); *see* TEX. R. EVID. 606(b) ("[A] juror may not testify as to any matter or statement occurring during the jury's deliberations, or to the effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict."); *Golden Eagle Archery*, 24 S.W.3d at 370.

## B. Discussion

### 1. Affidavits

In support of their jury misconduct allegations in their motion for new trial, EC and GSI attached the affidavits of the two dissenting jurors. The affidavits set out the following three instances that allegedly occurred during jury deliberations:

- One juror reported to other jurors that she had been informed of a death in her family, and she switched her vote in order to conclude the deliberations more quickly;

- Another juror admitted that he read on the internet the appellate decision concerning the first trial of this case; and

- A third juror stated that he knew that the Sanchez family[2] had a lot of money and that his (the juror's) sister was an attorney.

#### a. Death in Juror's Family

Personal pressures felt by jurors to wrap up the deliberations do not constitute

---

[2] At trial, Marco Antonio Sanchez described the Sanchez family business as a medium-size media company in Mexico. In late 1977, the Sanchez family acquired EC, known at that time as Caballero Con Le Mejor de Playboy. Marco's father, Javier Sanchez, was the president of EC who, on EC's behalf, executed the License Agreement that forms the basis of this lawsuit.

outside influences.  *See, e.g., Rosell v. Cent. W. Motor Stages, Inc.*, 89 S.W.3d 643, 660-61 (Tex. App.—Dallas 2002, pet. denied) (explaining that a statement by the bailiff to jurors that they would have to deliberate another day if they told the court that they were deadlocked was not outside influence); *Perry v. Safeco Ins. Co.*, 821 S.W.2d 279, 281 (Tex. App.—Houston [1st Dist.] 1991, writ denied) (concluding that family pressure to go on vacation was not outside influence); *Kirby Forest Indus., Inc. v. Kirkland*, 772 S.W.2d 226, 234 (Tex. App.—Houston [14th Dist.] 1989, writ denied) (holding that pressure from employers to return to work, and family, recreational, and personal pressures are not outside influences).   The trial court could have reasonably determined that the portions of the jurors' affidavits discussing another juror's statements about a death in her family related to the effect of the death on the juror's mind or emotions or mental processes, as influencing her assent to or dissent from the verdict.   *See* TEX. R. CIV. P. 327(b); TEX. R. EVID. 606(b); *Golden Eagle Archery*, 24 S.W.3d at 370; *Goode*, 943 S.W.2d at 446. Therefore, misconduct did not occur, and the trial court could have concluded that the affidavits were incompetent and inadmissible in this regard.

### b.     Appellate Decision Read on the Internet

The trial court could have made the same determination regarding the portion of one juror's affidavit explaining that another juror said, during deliberations, that he had read the appellate decision involving the first trial.  The affidavit which stated that the juror read the decision on the internet, implies internet research.  The affidavit did not state, however, that the juror said anything more about the opinion.

In a criminal context, this Court recently decided the issue of whether internet research constitutes an "outside influence."   *See McQuarrie v. State*, No.

13-09-00233-CR, 2011 Tex. App. LEXIS 2859, at *13-18 (Tex. App.—Corpus Christi Apr. 14, 2011, pet. granted) (mem. op., not designated for publication) (citing *Soliz,* 779 S.W.2d at 931-32).[3]   In *McQuarrie,* we held that "independent research on the internet [conducted by a juror] during an overnight recess and conveyed . . . to the other jurors during deliberations the next morning" did not constitute an outside influence.   *Id.*; *see Mathis v. State*, No. 05-05-01119-CR, 2006 Tex. App. LEXIS 4645, at *24-27 (Tex. App.—Dallas May 31, 2006, no pet.) (not designated for publication) (holding internet research did not constitute an outside influence); *Johnson v. State*, No. 08-05-00017-CR, 2006 Tex. App. LEXIS 8618, at *7-8 (Tex. App.—El Paso Oct. 5, 2006, no pet.) (not designated for publication) (concluding that information found on a computer system was not an outside influence); *see also Lucero v. State*, 246 S.W.3d 86, 95 (Tex. Crim. App. 2008) (noting that the State relied primarily on civil cases in support of its position "that the Bible reading [by the jury foreman during jury deliberations] was not an "outside influence" and that appellant was, therefore, improperly attempting to impeach the jury's verdict under Rule 606(b)") (citing *Golden Eagle Archery*, 24 S.W.3d at 366-75 (rules contemplate that an "outside influence" originates from sources other than the jurors themselves); *Brandt v. Surber*, 194 S.W. 3d 108, 134 (Tex. App.—Corpus Christi 2006, pet. denied) (a jury's discussion of newspaper articles is not an "outside influence"); *Easly v. State*, 163 S.W.3d 839, 842 (Tex. App.—Dallas 2005, no pet.) (a chart brought into jury room with calculations of time appellant would serve in prison after application of the

---

[3] The Texas Court of Criminal Appeals recently granted petition in *In re McQuarrie*, without oral argument, on the following issue:  Did the court of appeals violate McQuarrie's federal and state constitutional right to confrontation and cross-examination by upholding the trial court's exclusion, pursuant to Texas Rule of Evidence 606(b), of juror testimony and affidavits offered for purposes of his motion for new trial on the ground that a juror conveyed to other jurors harmful information obtained from her internet research during an overnight break in deliberations?   No. PD-0803-11, 2011 Tex. Crim. App. LEXIS 1517, at *1 (Tex. Crim. App. Nov. 16, 2011).

parole laws is not an "outside influence"); *Perry*, 821 S.W.2d at 281 (juror using dictionary to share a definition with other jurors is not an "outside influence")). In *McQuarrie*, we also held that "the trial court properly excluded the affidavits and testimony" of the jurors because the affidavits did not contain any evidence of outside influence and that the trial court "did not abuse its discretion in denying [plaintiff's] motion for new trial on this basis." 2011 Tex. App. LEXIS 2859, at *17.

Holding that internet research does not constitute an outside influence is also consistent with the general rule that "[i]nformation gathered by a juror and introduced to the other jurors by that juror, even if the information were introduced to prejudice the vote, does not add up to outside influence." *Soliz*, 779 S.W.2d at 932; *see Brandt*, 194 S.W.3d at 134 ("[One juror's] affidavit stating that other jurors discussed newspaper articles during deliberations was not evidence of any outside influence, but only described matters on the minds of other jurors during deliberations. The affidavit is, therefore, incompetent to serve as evidence of juror misconduct."). The trial court could have reasoned that evidence of a juror reviewing this Court's earlier opinion found on the internet, without more, described only matters on the mind of this juror during deliberations. Thus, it could have concluded that the affidavit was incompetent on this basis as well. *See* TEX. R. CIV. P. 327(b); TEX. R. EVID. 606(b).

### c. Information Regarding the Sanchez Family and the Jury Foreman's Sister

The same analysis applies to EC and GSI's supporting affidavits setting out that "the jury foreman stated during jury deliberations that he knew the Sanchez family had a lot of money" and that "the jury foreman . . . sa[id] that his sister is an attorney and that he knew both the business and financial background of the Sanchez family." Once again,

8

the trial court could have determined that these statements proffered by EC and GSI through the affidavits are incompetent and inadmissible because they occurred during deliberations and do "not add up to outside influence." *Soliz*, 779 S.W.2d at 932. The trial court could have, therefore, concluded that these statements from the affidavits describe only matters on the mind of another juror during deliberations. *See* TEX. R. CIV. P. 327(b); TEX. R. EVID. 606(b); *Brandt*, 194 S.W.3d at 134.

### 2. Evidentiary Hearing

EC and GSI also argue that when an affidavit avers misconduct, the language of rule 327(a) requires that the trial court grant an evidentiary hearing. *See* TEX. R. CIV. P. 327(a) ("When the ground of a motion for new trial, supported by affidavit, is misconduct of the jury . . . the court shall hear evidence thereof from the jury or others in open court . . . ."). EC and GSI contend that, in this case, the trial court abused its discretion when it did not hold such a hearing.

In support of this argument, EC and GSI rely on *Sharpless v. Sim*. *See* 209 S.W.3d 825, 828 (Tex. App.—Dallas 2006, pet. denied). In *Sharpless*, a verdict for the plaintiff was entered in a double fatality driving accident. *Id.* at 827. After the verdict, the parties learned that one of the jurors had conducted her own independent internet research of the defendant's driving record. *Id.* After conducting an evidentiary hearing, the trial court denied the defendant's motion for new trial based upon jury misconduct. *Id.* EC and GSI argue that *Sharpless* demonstrates the necessity of an evidentiary hearing when proof is adduced that a juror improperly conducted research on the internet.

However, the *Sharples* Court did not consider whether an evidentiary hearing on jury misconduct is mandatory or whether internet research constitutes an outside

9

influence because neither party disputed these matters. *See id.* at 827-28. Rather, the *Sharpless* Court conducted an unchallenged hearing and considered only whether the internet research caused injury. *Id.* (citing TEX. R. CIV. P. 327(a); *Golden Eagle Archery*, 24 S.W.3d at 372). Finding none, the court concluded that the trial court did not abuse its discretion when it determined that Sharpless and Southwestern failed to discharge their burden under rule 327(a). *See id.* at 829. *Sharpless* is, thus, distinguishable from the present case and provides no support for EC and GSI's evidentiary hearing argument.

Moreover, while we agree with EC and GSI's basic contention that when an affidavit avers jury misconduct the trial court should grant an evidentiary hearing, in this case we have already concluded that the affidavits attached to EC and GSI's motion for new trial provided no evidence of an outside influence. *See* TEX. R. CIV. P. 327(a); *King*, 767 S.W.2d at 198-99 (concluding trial court did not err in refusing to consider the juror's testimony concerning jury misconduct which included reading outside newspaper accounts because her affidavit did not raise an outside-influence issue); *see also de Damian v. Bell Helicopter Textron, Inc.*, No. 02-08-00210-CV, 2011 Tex. App. LEXIS 7316, at *91-95 (Tex. App.—Fort Worth Aug. 31, 2011, pet. dism'd) (concluding that where affidavits did not raise outside influence, the trial court was not required to receive juror affidavits or testimony); *Davis v. BNSF Ry. Co.*, No. 10-09-00309-CV, 2010 Tex. App. LEXIS 8201, at *8 (Tex. App.—Waco Oct. 6, 2010, pet. denied) (mem. op.) (holding that affidavits filed in support of a motion for new trial were insufficient to require an evidentiary hearing because they raised "only speculation of possible outside influence"; therefore, the trial court did not err in quashing subpoenas of jurors); *WPS, Inc. v. Enervest Operating, L.L.C.*, No. 01-06-00759-CV, 2010 Tex. App. LEXIS 4233, at *51-53

10

(Tex. App.—Houston [1st Dist.] May 28, 2010, pet. denied) (mem. op. on reh'g) (upholding the striking of juror affidavits regarding juror misconduct under rule 327(b) and rule 606(b) because the affidavits were "patently inadmissible" which was implicitly acknowledged by WPS in its brief); *Villegas v. State*, No. 13-05-371-CR, 2008 Tex. App. LEXIS 1899, at *40-46 (Tex. App.—Corpus Christi Mar. 13, 2008, pet. denied) (mem. op., not designated for publication) (determining that when a juror affidavit failed to establish outside influence, a juror could not testify about what happened during deliberations, and the trial court did not err in striking juror affidavits). Because the affidavits did not aver jury misconduct, the trial court did not err in refusing to consider the affidavits or the testimony of the jurors at a hearing.

### 3. Summary

Based on the above, the matters set out in the affidavits did not constitute improper outside influences warranting a new trial under Texas law. Because EC and GSI submitted no evidence tending to show juror misconduct, the trial court properly sustained PEI's objections to the affidavits, properly struck the affidavits, and properly denied EC and GSI's request for an evidentiary hearing. The trial court did not abuse its discretion in so concluding and, further, did not abuse its discretion in denying EC and GSI's motion for new trial on that basis. We overrule EC and GSI's first issue.

## II. EVIDENTIARY CHALLENGES TO ADVERSE FINDINGS

By their second and third issues, EC and GSI challenge every adverse jury finding, most of which are challenges to the sufficiency of the evidence.

## A. Standard of Review for Sufficiency Challenges

"When a party attacks the legal sufficiency of an adverse finding on an issue on

11

which [it] has the burden of proof, [that party] must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam). When an appellant attacks the legal sufficiency of an adverse finding on an issue for which it did not have the burden of proof, the appellant must demonstrate that there is no evidence to support the adverse finding. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005); *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983). Such a no-evidence challenge will be sustained only if: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *City of Keller*, 168 S.W.3d at 810; *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). In conducting a legal sufficiency review, we review the evidence presented at trial in the light most favorable to the jury's verdict and indulge every reasonable inference that would support it, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 770 (Tex. 2010); *City of Keller*, 168 S.W.3d at 822, 827. "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller*, 168 S.W.3d at 827.

In reviewing a factual-sufficiency challenge to a jury finding on an issue on which the appellant had the burden of proof, the appellant must show that "the adverse finding is

12

against the great weight and preponderance of the evidence." *Dow Chem. Co.*, 46 S.W.3d at 242. In reviewing a factual-sufficiency challenge to a jury finding on an issue on which the appellant did not have the burden of proof, we consider and weigh all of the evidence and set aside the verdict only if the evidence that supports the jury finding is so weak as to make the verdict clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam); *Ins. Network of Tex. v. Kloesel*, 266 S.W.3d 456, 469-70 (Tex. App.—Corpus Christi 2008, pet. denied); *Bay, Inc. v. Ramos*, 139 S.W.3d 322, 329 (Tex. App.—San Antonio 2004, pet. denied) (en banc). In either type of factual-sufficiency challenge, we must examine both the evidence supporting and that contrary to the judgment. *See Dow Chem. Co.*, 46 S.W.3d at 242; *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). Additionally, the jury is the sole judge of witnesses' credibility, and it may choose to believe one witness over another; a reviewing court may not impose its own opinion to the contrary. *See Golden Eagle Archery*, 116 S.W.3d at 761.

## B. EC and GSI's Claims Against PEI

By their second issue, EC and GSI argue that the evidence is legally insufficient to support the jury's adverse findings on the following issues: (1) breach of the License Agreement; (2) common law fraud; (3) statutory fraud; (4) an antitrust violation; and (5) theft of property, a service, or trade secrets.[4] Because EC and GSI asserted these

---

[4] Although EC and GSI title their second issue a "factually insufficient and/or against the overwhelming weight of the evidence" issue, factual sufficiency is not raised in the body of their brief. Rather, the substance of this issue is based only on legal sufficiency principles, and we will review the second issue accordingly. *Compare* TEX. R. APP. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal."), *and Martinez v. El Paso County*, 218 S.W.3d 841, 844 (Tex. App.—El Paso 2007, pet. dism'd) ("When reviewing a civil matter, an appellate court has no discretion to consider an issue not raised in the appellant's brief."), *with* TEX. R. APP. P. 38.1(f) ("The statement of an issue or point will be

claims against PEI, they had the burden of proof on all related evidentiary issues.

## 1. Breach of the License Agreement

EC and GSI argue that the evidence is legally insufficient to support the jury's finding that PEI did not fail to comply with the License Agreement. They contend that there is undisputed and conclusive evidence that PEI breached the License Agreement in the following ways: (1) by failing to provide them with certain written information as required by Paragraph 8a of the Licensing Agreement; (2) by first agreeing to allow a monthly distribution of 225,000 copies into the U.S. and then unilaterally refusing to allow any more than 39,950 copies for monthly distribution; and (3) by not complying with its contractual obligation of good faith and fair dealing.

### a. Internal Memoranda

EC and GSI assert that PEI breached the last sentence of Paragraph 8a of the License Agreement which states, "In the event Licensor does not approve any aspect of the Foreign Edition, Special Issues or Calendar, Licensor [PEI] will advise Licensee [ES and GSI] in what respect any such aspect is unacceptable." EC and GSI complain that PEI breached this provision because it did not provide them with certain written internal memoranda dated December 9, 1996, February 4, 1997, and February 7, 1997—memoranda from Hugh Hefner to *Playboy* executives expressing his general

---

treated as covering every subsidiary question that is fairly included."), *and Hagberg v. City of Pasadena*, 224 S.W.3d 477, 480 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (providing that even though a specific point may not be recited within a statement of issues presented, that point is not waived if raised within the body of the brief). Nonetheless, to the extent the second issue could be construed as a challenge to the factual sufficiency of the evidence, under the proper standard of review we would further conclude that the adverse findings were not against the great weight and preponderance of the evidence. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam).

concerns about a Spanish edition of *Playboy* being distributed in the U.S.[5]   We disagree.

Paragraph 8a, in its entirety, provides the following:

> Licensee acknowledges that Licensor has an interest in maintaining the worldwide goodwill and recognition of the Trademarks and in being assured that the Foreign Edition, Special Issues, and Calendars correspond as closely as possible in quality, format and content to their American counterparts; and Licensor acknowledges that Licensee has an interest in maintaining a quality that meets its standards and in producing a Foreign Edition, Special Issues and Calendars that meet the needs of the relevant market.   For the foregoing reasons, it is agreed that both Licensor, or its authorized representative, and Licensee must approve in writing (by initialing where appropriate) in advance of publication, all aspects of each issue of the Foreign Edition, and each and every Special Issue and Calendar, including but not limited to, all aspects of advertising (including advertisers, products advertised, advertising copy, sales practices and terms), all editorial text (whether originating in the U.S.A., the Territory, or elsewhere, including translations), all photographs and cartoons, all aspects of editorial design and structure (including design, artwork, layout and design and copy lines of the front cover), all aspects of manufacturing and production (including paper, printing and binding), all advertisements, publicity and promotional material regarding the Foreign Edition, Special Issues and Calendars (including advance information to be given to news media) and all aspects of distribution (including the cover price and discount for newsstand sale and subscription prices).   In the event Licensor does not approve any aspect of the Foreign Edition, Special Issues or Calendar, Licensor will advise Licensee in what respect any such aspect is unacceptable.

EC and GSI contend that, in addition to Paragraph 8a's required pre-publication, written

*approval* of all aspects of each issue, through Paragraph 17 of the License Agreement,

---

[5] Hugh Hefner sent a December 9, 1996 memo to Christie Hefner, among others, reiterating that he did not want a second language version competing with *Playboy* in the United States and explaining that "[w]ith the acquisition of the Mexican Playboy by a U.S. firm, it is important to make clear that the editorial focus and distribution of this Spanish language version of the magazine remain essentially Mexican."   In his February 4, 1997 memo to Henry Marks, after setting out that he had no problem with a direct Spanish translation if they owned the magazine, Heftner continued, "But I have already rejected the idea of a separate Spanish language edition of PLAYBOY in the U.S. as being too confusing.   And I am even more opposed to allowing some outside company [to] own and distribute a Spanish edition (Mexican or other) here in the U.S."   Finally, Hefner's February 7, 1997 memo sent to Christie Hefner expressed the following: "I think it is naive to assume that distributing 100,000 copies of a Mexican edition of PLAYBOY in the United States won't have some impact on the newsstand sales of the U.S. edition when our own single copy sales are often no more than 500,000."

Licensor PEI was to provide written notice of its *disapproval* of any such aspect. Paragraph 17 provided that "[a]ll legal notices, consents, and other communications required by the terms of this agreement . . . shall be in writing."

It is undisputed that Paragraph 8a provided for pre-publication, written approval of aspects of each issue or edition. Pursuant to Paragraph 8a, the specific aspects of distribution that required such approval included the cover price, any discounts for newsstand sales, and the subscription price. And, assuming without deciding that the last sentence of Paragraph 8a through Paragraph 17 required PEI to advise EC and GSI, in writing, of any unacceptable aspects, the question becomes, did the evidence establish that the Hugh Hefner written memoranda expressed disapproval of an aspect of the magazine covered by Paragraph 8a, such that PEI was required to provide those memos to EC and GSI.

Although the evidence established that Hugh Hefner expressed his concern about the development of a Spanish language version of *Playboy* to be distributed in the U.S. and that PEI did not provide either EC or GSI with Hefner's written memoranda that addressed his concerns, a reasonable jury could have concluded that the Hefner memoranda did not address any aspect of any issue of the Foreign Edition, Special Issues, or Calendar that was identified in Paragraph 8a. The jury could have rationally concluded that, through these memos, PEI was not disapproving or refusing to approve any specific Paragraph 8a aspect. Thus, a reasonable jury could have concluded that PEI was not required to advise EC and GSI of Hefner's concern by providing them with his memoranda. Rather, the evidence establishes that three issues of the magazine, the October, November, and December 1997 issues, were distributed in the U.S. This

16

evidence supports a determination that PEI approved, for U.S. distribution, all Paragraph 8a aspects of the three issues, including the cover price, the discount for newsstand sale, and the subscription price. After so concluding, the jury could have reasonably determined that PEI did not fail to comply with the License Agreement in this regard. *See City of Keller*, 168 S.W.3d at 827.

### b. Number of Copies for Distribution in the U.S.

As a second breach-of-contract theory, EC and GSI argue that PEI breached the last sentence of Paragraph1.a(ii) of the License Agreement when it limited *distribution* of each of the three issues of the Foreign Edition to 39,950 copies. Paragraph 1.a.(ii) provides, in relevant part, the following:

> Licensor's approval of such distribution and sale in the United States, if at all, will not occur until at least six (6) months following the legal formation of the joint venture Grupo Siete International, Inc., and if such approval is granted, will not exceed one-hundred-fifty thousand (150,000) copies per issue.

EC and GSI assert that "[w]here, as here, a reasonable construction of this clause is that it allows the monthly distribution of a quantity higher than the actual sale[s] amount of 150,000 copies per month, this [t]rial [c]ourt should have declared that the contract was breached as a matter of law" because PEI approved only 39,950 copies per issue for distribution in the U.S. EC and GSI contend that although this provision may limit sales, it does not limit distribution and PEI should have allowed monthly *distribution* of more than 150,000 issues in order to accomplish an actual *sale* of 150,000 copies.

At EC and GSI's request, the trial court submitted the meaning of this provision to the jury through the following instruction in Question 1A: "The [c]ourt further instructs you that [this] term of the License Agreement is ambiguous, which means that it is

17

susceptible to more than one meaning." It is clear, however, that the jury rejected EC and GSI's suggested construction and resolved ambiguity, if any, against EC and GSI when it found that PEI did not fail to comply with the License Agreement. By so finding, the jury impliedly concluded that this provision expressly allowed PEI to set U.S. sales *and* distribution figures at a number not to exceed 150,000 copies per month, and therefore, PEI did not breach that provision when it formally approved a monthly distribution in the U.S. of 39,950 copies. Thus, we are not persuaded by this argument, especially in light of the fact that the ambiguity instruction was submitted to the jury at EC and GSI's request. *See Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 862 (Tex. 2005) (per curiam) (explaining that a party cannot complain on appeal that the trial court took a specific action that the complaining party requested).

EC and GSI also contend that, under this theory of recovery, the evidence is legally insufficient to support this adverse finding as a matter of law. They assert that there is undisputed and conclusive evidence that establishes PEI agreed to allow monthly distribution of 225,000 copies of the Spanish language version of *Playboy* in the U.S. and breached the License Agreement when it only allowed the monthly distribution of 39,950 copies. In support of this argument, EC and GSI point to PEI's approval of the use of a media kit which identified a monthly distribution objective of 225,000 copies.[6] However, we have already determined that the "media kit was not the formal written approval for U.S. distribution required by the License Agreement." *Playboy I*, 202 S.W.3d at 259. Thus, this argument fails under the law of the case doctrine. *See Hudson v. Wakefield*, 711 S.W.2d 628, 630 (Tex. 1986).

---

[6] Fernando Peramo, EC and GSI's editor-in-chief for the Mexican *Playboy* magazine, described the media kit as a "presentation of what we send advertisers."

18

In support of their contention that the evidence conclusively establishes that PEI approved a 225,000 distribution figure, EC and GSI also reference testimony provided by Marco Sanchez, Paul Siegel, Randy Hills, and Fernando Peramo, all executives or employees of either PEI or EC during the relevant time period. Our review of the evidence, however, reveals that this referenced testimony is based on PEI's asserted approval of the media kit; therefore, it provides no support. EC and GSI refer us to no evidence, and we find none, that PEI gave written approval for the distribution of 225,000 copies per issue. Rather, reviewing the evidence in the light most favorable to the verdict, the testimony of Marco Sanchez and Hills supports a determination that the only written approval given by PEI was for the distribution of 39,950 copies.

Finally, the jury could have credited favorable testimony provided by Javier Sanchez, an experienced businessman who signed the License Agreement on behalf of EC, and disregarded contrary evidence, if any, that PEI approved the distribution of 225,000 copies. *See Del Lago Partners*, 307 S.W.3d at 770; *City of Keller*, 168 S.W.3d at 822, 827. Javier Sanchez testified that he read and understood the agreement; his lawyers also read the agreement and advised him concerning it; and he discussed the meaning of the agreement with PEI representatives. In addition, Javier Sanchez agreed that, going into the agreement, he understood that the distribution and sale of the Spanish-language version of the magazine in any country other than Mexico would be subject to PEI's prior written approval that could be withdrawn once given on notice from PEI and that such approval, if any, would not exceed 150,000 copies per issue—in other words, the maximum amount of copies per issue would be 150,000. The jury could have reasonably concluded that Javier Sanchez understood that the License Agreement set

19

out a maximum of 150,000 copies per issue for sale *and* for distribution in the U.S. and that the understanding or agreement did not set the lower or actual limit that PEI would approve. And after so concluding, the jury could have reasonably determined that PEI did not fail to comply with the License Agreement in this regard. *See City of Keller*, 168 S.W.3d at 827.

### c. Good Faith and Fair Dealing

As a third theory of recovery on their breach-of-contract claim, EC and GSI argue that PEI did not act in good faith and failed to cooperate or to deal fairly with them.[7] EC and GSI contend that the following evidence conclusively established this breach: (1) certain internal memoranda were not turned over or discussed with EC and GSI; (2) PEI interfered with EC and GSI's attempt to distribute the magazines within the U.S.; and (3) after EC and GSI received a default letter and offered to pay PEI $50,000 in exchange for PEI's agreement to sit down in good faith and cooperate with them, PEI refused to do so, instead choosing to terminate the License Agreement. We disagree.

Under Illinois law, parties to a contract "are entitled to enforce the terms of a contract to the letter and an implied covenant of good faith cannot overrule or modify the express terms of a contract."[8] *N. Trust Co. v. VIII S. Mich. Assocs.*, 657 N.E.2d 1095,

---

[7] As part of Question 1A, the failure-to-comply question, the trial court included the following instruction:

> The [c]ourt instructs you the License Agreement includes an implied duty of good faith and fair dealing. This ensures parties do not take advantage in a way that could not have been contemplated at the time the contract was drafted or do anything that would destroy the other party's right to receive the benefit of the contract. Accordingly, a party with absolute discretion under a contract must exercise such discretion in a manner consistent with the reasonable expectations of the other party. Whenever the cooperation of one party is necessary for the other party's performance, there is an implied condition that such cooperation will be given.

[8] The trial court applied Illinois law to the License Agreement based on a choice-of-law provision contained in that agreement. The trial court also ruled that a duty of good faith and fair dealing existed

1104 (Ill. App. Ct. 1995); *see St. Mary's Hosp. v. Health Pers. Options Corp.*, 721 N.E.2d 1213, 1217 (Ill. App. Ct. 1999); *Harrison v. Sears, Roebuck & Co.*, 546 N.E.2d 248, 256 (Ill. App. Ct. 1989); *see also Resolution Trust Corp. v. Holtzman*, 618 N.E.2d 418, 423-24 (Ill. App. Ct. 1993) (explaining when a mortgage contract gave the lender a series of options to be exercised at its sole discretion, the duty of good faith and fair dealing could not negate the lender's right to choose and exercise those options). We have already concluded that PEI was exercising its rights under the terms of its contract with EC and GSI when it did not disclose its internal memoranda and when it limited the distribution of monthly copies of the magazine. In addition, the evidence establishes that EC and GSI's $50,000 offer to pay was approximately half of what EC and GSI were contractually required to pay, and the License Agreement expressly gave PEI the right to terminate for non-payment. Therefore, the jury could have reasonably concluded that PEI was exercising its contractual rights, which cannot be overruled or modified by an implied covenant of good faith, and, therefore, did not fail to comply with the License Agreement in this regard. *See N. Trust Co.*, 657 N.E.2d at 1104; *see also City of Keller*, 168 S.W.3d at 827; *State Nat'l Bank v. Academia, Inc.*, 802 S.W.2d 282, 293 (Tex. App.—Corpus Christi 1990, writ denied) (applying Illinois law).

### d. Summary

Reviewing the evidence presented at trial in the light most favorable to the jury's verdict and indulging every reasonable inference that would support it, we conclude that the evidence is legally sufficient to support the jury's adverse finding on all three

---

under Illinois law. Because PEI contends that the trial court improperly imposed a duty of good faith in this case, for the purposes of this analysis we will only assume, without deciding, that such a duty exists under Illinois law.

21

breach-of-contract theories of recovery set out above. *See Del Lago Partners, Inc.*, 307 S.W.3d at 770; *City of Keller*, 168 S.W.3d at 822, 827. The evidence would enable reasonable and fair-minded people to reach the verdict under review. *See City of Keller*, 168 S.W.3d at 827.

## 2. Fraud

EC and GSI also contend that the evidence is legally insufficient to support the jury's adverse fraud findings. They argue that the undisputed evidence conclusively established that PEI committed common law fraud and statutory fraud against them.

### a.   Common Law Fraud

The jury answered "No" to Question 2A, "Did [PEI] commit fraud against [EC or GSI]?" For this question, the trial court instructed the jury that fraud occurs when,

a.   a party fails to disclose a material fact within the knowledge of that party,

b.   the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth,

c.   the party intends to induce the other party to take some action by failing to disclose the fact, and

d.   the other party suffers injury as a result of acting without knowledge of the undisclosed fact.

Based on this instruction, in order to recover on this common law fraud claim, EC and GSI had to establish not only failure to disclose, but also that they were ignorant of the undisclosed facts and did not have an equal opportunity to discover the truth, that PEI intended to induce them to take an action based on the non-disclosure, and that they suffered injury as a result of the non-disclosure. On appeal, EC and GSI have not challenged the jury finding with respect to all elements. Because we must affirm the

22

take-nothing judgment on EC and GSI's common law fraud claim unless the evidence conclusively establishes all elements of the fraud claim and because EC and GSI, the parties that had the burden of proof, have not challenged the jury finding with respect to every element of that claim, their argument that the take-nothing judgment on their fraud claim must be reversed fails. *See Dow Chem. Co.,* 46 S.W.3d at 241; *Rich v. Olah*, 274 S.W.3d 878, 886-88 (Tex. App.—Dallas 2008, no pet.).

### b.      Statutory Fraud

The jury also answered, "No," to the statutory fraud Questions 3A, 4A, and 5A, "Did [PEI] commit statutory fraud as defined [in the respective questions] against [EC and GSI]?"   On appeal, EC and GSI assert that PEI committed statutory fraud because,

> PEI never told [EC and GSI] about the true extent of [Hugh Hefner's] objections and concerns.   The internal memos from Hugh Hefner, referred to above, make reference to the fact that such concerns were "previously expressed," within the PEI organization.   In addition, multiple other memos, such as ones from Dick Rosenzweig, the Executive Assistant to Hugh Hefner and member of PEI's Board of Directors, reveal the true depth of Mr. Hefner's concerns.

EC and GSI argue that PEI had a legal duty to disclose this information.

However, none of the statutory fraud jury questions involve non-disclosure. Question 3A asked about false representations of a past or existing material fact that was made to and relied on by EC or GSI in entering into a contract; Question 4A asked about a false material promise to do an act with the intent of not relying on it that was made to relied on by EC or GSI in entering into a contract; and Question 5A asked about PEI's actual awareness of the falsity of a promise made by another person, its failure to disclose that false representation or promise, and a benefit received from it.   Thus, all three questions required EC and GSI to prove a false representation or promise.   On appeal,

23

their statutory fraud arguments do not identify any false representations or promises that PEI allegedly made. Furthermore, as with the common law fraud analysis, because we must affirm the take-nothing judgment on this statutory fraud claim unless the evidence conclusively establishes all elements of the claim and because EC and GSI have not challenged the jury finding with respect to all elements of that claim, their argument fails. *See Dow Chem. Co.,* 46 S.W.3d at 241, *Rich*, 274 S.W.3d at 886-88.

### 4. Antitrust Violation

EC and GSI challenge the legal sufficiency of the evidence to support the jury's adverse antitrust finding that PEI did not engage in a contract, combination, or conspiracy in restraint of trade or commerce that harmed EC or GSI. More specifically, EC and GSI assert the following:

> [T]he undisputed evidence conclusively established that PEI stole EC's and GSI's money, business, License Agreement, goodwill, customer lists, advertisers, distributors, customers, vendors, and subscribers by duping EC and GSI into believing that the export of the Foreign Edition was a genuine project, when in reality this project would and could not go forward unless and until PEI owned it for itself. In furtherance of this theft, PEI allowed three issues of the Foreign Export to enter the United States in the fall of 1997, at a substandard number of distributed copies, knowing full well that EC's and GSI's business would not be viable at these numbers, but in an effort to test the market for consumer interest and potential for cannibalization of U[.]S[.] Playboy so that PEI could then force EC and GSI out of business and steal this project for PEI. Additionally, the undisputed evidence conclusively established that PEI engaged in the following conduct: (1) Hugh Hefner's and/or PEI's actions to own this project; (2) Hugh Hefner's and/or PEI's attempts to monopolize the marketplace in the USA and prevent competition with U[.]S[.] Playboy by EC and GSI; (3) PEI's internal plan to force EC and GSI into a material default under the License Agreement; (4) PEI's internal plan to forcibly take over one or both of EC and GSI over their objection, so that PEI could own the project; (5) PEI's internal plan to sell Foreign Editions for direct PEI profit; and (6) PEI's internal plan to pursue this project as either a 100% PEI owned project or at least one in which PEI controlled the project and had a majority and/or substantial ownership interest in the project.[ ]

24

In support of this argument, EC and GSI rely on ten PEI memoranda that were admitted as trial exhibits. EC and GSI assert that "[t]hese documents evidence not only an agreement by and amongst employees of PEI, but also with Hugh Hefner, the majority stockholder of the entity, as well as persons outside the company." Without further citation to the reporter's record, EC and GSI contend that,

> [i]n addition to the document[s] mentioned above, there is undisputed and conclusive evidence of an agreement involving Christie Hefner and/or PEI and/or Hugh Hefner and/or Laura de Laviada and/or others, which demonstrates that there was an agreement between PEI and a third party to completely disrupt the contract that the parties had entered into.

The following antitrust question was submitted: "Did [PEI] engage in a contract, combination, or conspiracy in restraint of trade or commerce that harmed [EC or GSI]?" *See* TEX. BUS. & COM. CODE ANN. § 15.05(a) (West 2011).[9] The charge included no instructions or definitions.

At the charge conference, PEI requested the following instruction, which read in relevant part as follows:

> To establish their [antitrust violation] claim, EC and GSI must prove each of the following elements:
>
> 1. That Playboy entered an agreement with another corporation or with a person who was not an officer, director, agent, or employee of Playboy . . . .

PEI correctly argued that the charge was defective because it submitted a claim for agreement in restraint of trade but omitted the required elements of that claim, including that PEI entered into an agreement with another person—another corporation or a person who is not an officer, director, agent, or employee of PEI. The trial court refused PEI's

---

[9] Section 15.01(a) of the Texas Free Enterprise and Antitrust Act "adopted the language of the federal Sherman Antitrust Act." *Red Wing Shoe Co., Inc. v. Shearer's Inc.*, 769 S.W.2d 339, 343 (Tex. App —Houston [1st Dist.] 1989, no writ).

25

request.

"The Texas Free Enterprise and Antitrust Act [TFEAA] provides that '"every contract, combination, or conspiracy in restraint of trade is unlawful."' *Levinthal v. Kelsey-Seybold Clinic, P.A.,* 902 S.W.2d 508, 511 (Tex. App.—Houston [1st Dist.] 1994, no writ) (quoting TEX. BUS. & COM. CODE ANN. § 15.05(a)); *see also Puentes v. Spohn Health Network*, No. 13-08-00100-CV, 2009 Tex. App. LEXIS 4131, at *13 (Tex. App.—Corpus Christi June 11, 2009, pet. denied) (mem. op.). In order to establish a violation of section 15.05 of the TFEAA, EC and GSI were "required to prove a concerted action by two or more persons." *Levinthal,* 902 S.W.2d at 511 (citing *Red Wing Shoe Co., Inc. v. Shearer's Inc.*, 769 S.W.2d 339, 344 (Tex. App.—Houston [1st Dist.] 1989, no writ)). "To show a concerted action by two or more persons to illegally restrain trade, a plaintiff faces the threshold requirement of identifying a co-conspirator." *Levinthal,* 902 S.W.2d at 511 (citing *Red Wing Shoe Co.*, 769 S.W.2d at 345).

Moreover, "[a] company cannot conspire with its own employees as a matter of law." *Red Wing Shoe Co.*, 769 S.W.2d at 345; *see Jack Russell Terrier Network of N. Ca. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1034-35 (9th Cir. 2005) (explaining that under the federal act, co-conspirators must be "actual or potential competitors" and "separate entities pursuing different economic goals" with "divergent economic interests"); *Arnold Pontiac-GMC, Inc. v. Gen. Motors Corp.*, 786 F.2d 564, 574 (3d Cir. 1986) ("[T]here is no conspiracy or concerted action for the purpose of Section 1 of the Sherman Act when a corporation merely acts in concert with its own employees[.]"); *Solomon v. Houston Corrugated Box Co.*, 526 F.2d 389, 396 (5th Cir. 1976) ("it is well-settled that the Sherman Act's conspiracy or agreement requirement is not met by a

26

'conspiracy' between a corporation and its corporate officer[.]"). And one cannot sustain an action under subsection 15.05(a) of the TFEAA regarding conspiracies or combinations in restraint of trade when he has not provided any evidence that the defendant engaged in any concerted action with any other independent entity. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 761-62 (1984) (noting that in order to recover under the federal act, a plaintiff must assert concerted action between two or more entities); *Red Wing Shoe Co.*, 769 S.W.2d at 345; *see also Puentes*, No. 13-08-00100-CV, 2009 Tex. App. LEXIS 4131, at *13 ("[A] violation of subsection 15.05(a) cannot be based on concerted action between a corporation and its wholly-owned subsidiary . . . .").

Now, on appeal, because PEI objected to the charge as defective on the basis that it omitted a required element of an antitrust claim—that PEI entered into an agreement with another person—we measure the sufficiency of the evidence not by the charge but by the antitrust law set out above. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (providing that when a complaining party has not alerted the trial court of an alleged defect by objecting to the court's charge, it is the charge, and not some other, unidentified law, against which we measure sufficiency of the evidence); *see also Equistar Chem., L.P. v. Dresser-Rand Co.*, 240 S.W.3d 865, 868 (Tex. 2007) (concluding that an argument that the charge submitted an improper measure of damages was waived by failure to present to trial court); *Gen. Chem. Corp. v. De La Lastra*, 852 S.W.2d 916, 920 (Tex. 1993) (holding that the failure to object to jury questions based on state law waived assertion on appeal that federal maritime law controlled). Therefore, EC and GSI must show that the evidence establishes that PEI entered into a conspiracy, combination, or

27

conspiracy with a separate and independent business or person, *see Levinthal*, 902 S.W.2d at 511, and based on our review of the record, EC and GSI have not done so.

Much of EC and GSI's antitrust argument focuses on various alleged internal plans of PEI. The memoranda referenced by EC and GSI discuss PEI's position regarding distribution of the Spanish edition of *Playboy* in the U.S., its evolving relationship with EC and GSI, and viable options that would allow for the continued publication of a Spanish language magazine. The memoranda, however, do not conclusively establish that PEI engaged in a contract, combination, or conspiracy in restraint of trade or commerce against EC and GSI with another person or business, as they assert. Rather, with only one exception, the referenced memoranda establish that PEI was reviewing the venture and was planning internally. An internal plan is not a contract, combination, or conspiracy with a separate and independent business or person, and evidence of an agreement between or among PEI's employees, agents, officers, directors, and/or stockholders does not conclusively establish the agreement element of an antitrust claim.

Additionally, although EC and GSI assert that the evidence establishes that there existed an agreement between PEI and other persons outside the company, our review of the record reveals that the only unaffiliated person with whom PEI communicated was Laura de Laviada, a Mexican business woman. Marks identified her as a possible successor to EC and GSI; however, there is nothing in the record that establishes PEI reached an agreement with her. Christie Hefner testified that while she might have communicated in writing with de Laviada about the matter, she did not think that she had met with her and agreed that she had never made a deal with her in Mexico. Instead, Christie Hefner testified that after the contract was terminated with EC and GSI, it took

five years to find a new licensee to relaunch the publications in Mexico and the new licensee was not de Laviada.

Therefore, assuming without deciding that this is an antitrust claim and not just a claim for breach of contract as PEI urges,[10] reviewing the evidence presented at trial in the light most favorable to the jury's verdict and indulging every reasonable inference that would support it, we conclude that the evidence is legally sufficient to support the jury's adverse finding on the antitrust claim. *See Del Lago Partners, Inc.*, 307 S.W.3d at 770; *City of Keller*, 168 S.W.3d at 822, 827. The evidence would enable reasonable and fair-minded people to reach the verdict under review. *See City of Keller*, 168 S.W.3d at 827.

### 5. Theft of Property, Service, or Trade Secrets

Finally, EC and GSI contend that the undisputed evidence conclusively established that PEI committed theft of property, theft of a service, or theft of trade secrets from both EC and GSI. After generally asserting that the evidence conclusively establishes that PEI committed theft of property, a service, and trade secrets, EC and GSI repeat, for each asserted theft, the contentions and arguments made in their antitrust issue. They also rely on the same evidence. EC and GSI do not, however, discuss the elements of their theft claims, elements that were detailed in the jury charge. *See* TEX. R. APP. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal."); *Martinez v. El Paso County*, 218 S.W.3d 841, 844 (Tex. App.—El Paso 2007,

---

[10] PEI also asserts that there are other bases to deny recovery on this antitrust claim, including (1) EC and GSI do not have standing; (2) they failed to establish the relevant product and geographic market; and (3) they failed to establish any injury to their business in Texas. Because of the disposition of this issue, however, we need not address PEI's remaining responsive assertions. *See* TEX. R. APP. P. 47.1.

pet. dism'd) ("When reviewing a civil matter, an appellate court has no discretion to consider an issue not raised in the appellant's brief, even if the ends of justice so require."). Neither do they argue why the evidence is insufficient to support the jury's finding with respect to those elements. *See* TEX. R. APP. P. 47.1; *Martinez*, 218 S.W.3d at 844. Therefore, EC and GSI's argument that the take-nothing judgment on their theft claims must be reversed fails. *See* TEX. R. APP. P. 47.1; *Martinez*, 218 S.W.3d at 844; *see also Dow Chem. Co.,* 46 S.W.3d at 241; *Rich*, 274 S.W.3d at 886-88.

### 6. Summary

Based on the above analysis, we overrule EC and GSI's second issue challenging the jury's adverse findings on their claims against PEI.

## B. PEI's COUNTERCLAIMS

In their third issue, EC and GSI challenge all of the jury's findings on PEI's counterclaims.

### 1. Breach-of-Contract Counterclaims

EC and GSI first address the jury's findings in favor of PEI on its breach-of-contract counterclaims. Specifically, EC and GSI challenge the findings that they failed to comply with the agreements and that their failures to comply were not excused. They also appear to assert charge error when they argue that PEI failed to use or rely on Illinois law in their breach-of-contract jury questions.

#### a. Sufficiency of the Evidence to Establish Breach

EC and GSI challenge the sufficiency of the evidence to support the jury's findings that EC and GSI breached the License Agreement and the Renegotiated Payment Plan

Agreement—issues for which EC and GSI did not have the burden of proof.[11]   However, the evidence establishes that the License Agreement entitled PEI to $450,000 in guaranteed royalties over the term of the License Agreement, plus percentage royalties. This included a guaranteed 1997 royalty of $100,000 to be paid quarterly.   It is undisputed that as of November 1997 EC and GSI had not made their first three quarterly payments for that year and that the fourth quarterly payment was due.   EC and GSI also owed PEI $25,000 in other payments related to certain unaudited rebillables.

The License Agreement provided that the "failure of [EC] . . . to make any payment required hereunder within five (5) days after notice from [PEI] that . . . payment is past due" was an event authorizing termination.   On November 14, 1997, however, the parties signed the Renegotiated Payment Plan Agreement, providing that EC could have until December 18, 1997 to pay $100,000 of the overdue amount and until February 28, 1998 to pay the remaining $25,000.   Even with this extension, the evidence shows that EC did not make the payments as required.   PEI provided EC with the required notice and an opportunity to cure.   After EC failed to cure, PEI terminated the License Agreement.

Based on our review of the evidence under the appropriate standard, the evidence is sufficient to support the jury's findings that EC and GSI breached the License Agreement and the Renegotiated Payment Plan Agreement.   *See City of Keller*, 168 S.W.3d at 810; *Croucher*, 660 S.W.2d at 58.   It is legally sufficient because there is not a complete absence of evidence, but rather more than a scintilla of evidence, properly

---

[11] Question 15 asked whether EC and/or GSI failed to comply with the License Agreement, and Question 18 asked whether EC and/or GSI failed to comply with the Renegotiated Payment Plan Agreement.   To each question, the jury answered "Yes" for EC and "Yes" for GSI.

admitted, to support the findings and because the evidence does not establish conclusively the opposite of such findings, as urged by EC and GSI. *See City of Keller*, 168 S.W.3d at 810; *King Ranch, Inc.*, 118 S.W.3d at 751. Furthermore, we conclude that the evidence is factually sufficient because it is not so weak as to make the verdict clearly wrong and manifestly unjust. *See Cain*, 709 S.W.2d at 176; *Ins. Network of Tex.*, 266 S.W.3d at 469-70; *Bay, Inc.,* 139 S.W.3d at 329.

### b.    EC and GSI's Excuse Defense

EC and GSI also challenge the jury's refusal to find that their breaches were excused—an affirmative defense for which EC and GSI had the burden of proof.[12] *See Trencor, Inc. v. Cornech Mach. Co.*, 115 S.W.3d 145, 153 (Tex. App.—Fort Worth 2003, pet. denied) (citing TEX. R. CIV. P. 94) (setting out that excuse is an affirmative defense upon which the defendant has the burden of proof). Although the jury questions instructed the jury that EC and GSI's actions may be excused for PEI's prior breach, estoppel, or ratification, EC and GSI complain on appeal only of the jury's refusal to find prior breach—PEI's non-disclosure of the three Hefner internal memoranda—as an excuse. However, as set out above, there was sufficient evidence to support the jury's finding that PEI did not commit a breach of contract by keeping its internal memos internal. There likewise is evidence to support the jury's finding that EC and GSI's breaches of the License Agreement and the Renegotiated Payment Plan Agreement were not excused by any prior contractual breach on PEI's part. Thus, we conclude that the evidence is both legally and factually sufficient because the jury's answers are fully

---

[12] Question 16 asked if EC and/or GSI's failure to comply with the License Agreement was excused, and Question 19 asked if EC and/or GSI's failure to comply with the Renegotiated Payment Plan Agreement was excused. To each question, the jury answered "No" for EC and "No" for GSI.

32

supported by the evidence that would enable reasonable and fair-minded people to reach the verdict under review, *see City of Keller*, 168 S.W.3d at 827, and those adverse findings are not against the great weight of the evidence. *See Dow Chem. Co.*, 46 S.W.3d at 242.

### c. Illinois Law

EC and GSI contend that PEI intentionally omitted any reference to Illinois law in their breach-of-contract jury questions and, thereby, eradicated any entitlement it had to the jury's affirmative findings of breach. EC and GSI did not, however, object to the jury questions on the ground that they were allegedly being submitted under the wrong state's law. And they did not request the submission of any jury instructions relating to Illinois law to accompany the questions concerning PEI's breach-of-contract counterclaims. As a result, EC and GSI have waived any error on this basis. *See* TEX. R. CIV. P. 274 ("A party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection. Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections."); *Jarrin v. Sam White Oldsmobile Co.*, 929 S.W.2d 21, 25 (Tex. App.—Houston [1st Dist.] 1996, writ denied) ("To complain of the trial court's omission of a requested instruction on appeal, a party is obliged to make a written request to the trial court . . . .").

### d. Damage Award

Finally, EC and GSI argue that the evidence is insufficient to support the jury's awards of $312,500 and $48,750 in damages on PEI's breach-of-contract counterclaims. We are not persuaded by this argument because it is based on allegations which we have

33

already concluded are not supported by the record—that the evidence demonstrates that neither EC nor GSI breached the agreements, that PEI submitted its breach of contract claim without reference to Illinois law, and that the evidence demonstrates that the breaches were legally excused. Therefore, we need not address this contention further. *See* TEX. R. APP. P. 47.1.

### 2. Fraud Counterclaims

EC and GSI also contend that all findings against them on PEI's fraud claims were not supported by sufficient evidence. However, PEI elected to recover not on its fraud claims but on its breach of contract claims which we have concluded are supported by the evidence. We decline to address appellant's second issue as it is not dispositive to this appeal. *See id.*

### 3. Attorneys' Fees

Finally, EC and GSI challenge the jury's award of attorneys' fees in the amount of $1,680,000 and $500,000 contingent appellate fees. They first argue that PEI is not entitled to recover attorneys' fees, asserting that Illinois law precludes such an award. Relying on *Brundidge v. Glandale Fed. Bank* and *Hamer v. Kirk,* EC and GSI acknowledge that Illinois law permits the recovery of attorneys' fees where an agreement between the parties allows the successful litigant to recover attorneys' fees and the expenses of suit. *See Brundidge*, 659 N.E.2d 909, 911 (1995); *Hamer*, 356 N.E. 2d 524, 526 (1976). Here, the License Agreement expressly authorizes the recovery of attorneys' fees and litigation costs. Thus, this argument fails.

EC and GSI further argue that the award should be disregarded because PEI failed to introduce evidence of attorneys' fees incurred solely in connection with the

prosecution of the breach of contract claims, and because PEI brought both tort claims and contract claims, this failure to segregate fees is fatal to any right to recover fees. *See Varner v.* Cardenas, 218 S.W.3d 68, 698 (Tex. 2007). However, EC and GSI waived any objection to any failure to segregate by failing to object to the attorneys' fees jury question on the ground that PEI had not segregated its attorneys' fees. Where "[n]o objection [is] made based on the failure to segregate . . . any error in failing to segregate the fees [is] waived, and the trial court [can] only disregard the jury finding if it [is] unsupported by the evidence or [is] immaterial." *Estate of Montague v. Nat'l Loan Investors, L.P.*, 70 S.W.3d 242, 250 (Tex. App.—San Antonio 2001, pet. denied); *see also Petroleum Solutions, Inc. v. Head*, No. 13-09-00204-CV, 2011 Tex. App. LEXIS 3289, at *147 (Tex. App.—Corpus Christi Apr. 29, 2011, pet. filed) (mem. op.) (explaining that where the appellant "did not object to the segregation of [appellee's] attorney's fees and expenses, . . . [appellant's] segregation contention was waived"). In *Montague*, the court of appeals upheld the jury's attorneys' fee award where there had been no objection to the failure to segregate, and where, as here, the jury awarded less than the total amount of attorneys' fees sought. *See* 70 S.W.3d at 250.

Finally, EC and GSI also assert that the fees should be disregarded because the evidence conclusively demonstrated that neither EC nor GSI breached either the License Agreement or the Renegotiated Payment Plan Agreement and, if there was any breach, it was excused as a matter of law. We have already decided these evidentiary issues against EC and GSI and, therefore, need not address them as a basis for their attorneys' fees argument. *See* TEX. R. APP. P. 47.1.

### 4. Summary

Based on the above analysis, we overrule EC and GSI's third issue challenging the jury's findings in favor of PEI on PEI's counterclaims.

### III.  CONCLUSION

We affirm the judgment of the trial court.

NELDA V. RODRIGUEZ
Justice

Delivered and filed the 12th
day of January, 2012.

36