

NUMBER 13-13-00001-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

RUFINO IBANEZ AND
ANTONIO ARAIZA,                                                 Appellants,

## v.

GRACIELA ALONZO,                                                  Appellee.

On appeal from the 332nd District Court
of Hidalgo County, Texas.

# MEMORANDUM OPINION

**Before Justices Garza, Benavides, and Perkes**
**Memorandum Opinion by Justice Benavides**

This is an appeal from a judgment based on a jury award for damages in appellee

Graciela Alonzo's favor related to a 2009 auto accident. By three issues, which we

re-organize for clarity, appellants, Rufino Ibanez and Antonio Araiza, contend that (1) the

trial court reversibly erred by admitting an audio recording of Araiza; and (2) the

evidence is legally and factually insufficient to support the jury's verdict that (a) Araiza negligently entrusted his vehicle to a negligent driver and (b) Ibanez was the driver of the vehicle in question. We affirm.

## I.   BACKGROUND

Graciela sued Ibanez for the negligent operation of an automobile and Araiza for the negligent entrustment of his vehicle to Ibanez. The case was tried to a Hidalgo County jury, and the record reveals the following: Graciela drove her 2000 Mercury Sable in the late evening of January 31, 2009 in Hidalgo County, Texas, when another vehicle struck the driver's side of her Sable. According to Graciela, the other vehicle traveled down the left lane of FM 2812 and attempted to turn left into a drive-thru convenience store located on the right side of the road when it collided with her vehicle.

Graciela testified that the force of the crash shattered her driver's-side window and pushed her vehicle off the road. She further testified that after the crash, she could not open her driver's door, so she had to exit through the front passenger door. Once Graciela was outside of her vehicle, an unknown and unidentified woman tended her. According to Graciela, the woman asked her if she was okay, and the woman also identified a black truck with a white camper and hitch, that was still in the vicinity of the crash, as the vehicle responsible for the collision. The driver of the truck did not stop, but Graciela was able to jot down the first two numbers of the truck's license plate: "9" and "2." Graciela also observed that the truck's cabin light was on and described the driver of the truck as a "heavy set" man with a dark complexion and a beard.

After speaking to the police at the scene until 1 a.m., Graciela made her way home and spoke to her husband, Marcos. Graciela described to Marcos the truck that

2

she saw that night and also told him about its first two license plate numbers. Marcos testified that he suspected that the driver of the truck lived in the area because the drive-thru convenience store was the only one in the area. Following his suspicions, Marcos drove around the surrounding residential neighborhoods in search of the truck that Graciela had described. According to Marcos, he found the truck about one half-mile from the drive-thru convenience store and called the Texas Department of Public Safety (DPS) trooper who spoke to Graciela the previous night. Graciela also viewed the truck with Marcos and confirmed that it was the truck that she had observed the previous night. Marcos also observed that one of the truck's headlights was "hanging."

Marcos testified that the trooper arrived a short time later and spoke to the truck's owner, Araiza. According to Marcos, Araiza denied driving the truck on the previous night, but Araiza told the trooper that he "had lent it to somebody else."

Araiza failed to appear at trial, but he was represented by counsel and portions of his pre-trial deposition were read into evidence. Araiza testified that he owned a black 1999 Ford Ranger. Araiza stated that he decided to have a cookout at his house on the afternoon of January 31, 2009 and invited, among others, his cousin's husband, "Chapo," a neighbor, "Pepe," and another man, Ibanez, who had helped Araiza tend to his horses in the past.[1] Araiza testified that prior to the cookout, he had purchased three 24-packs of beer, and that he, along with Chapo, Pepe, and Ibanez, started drinking the beer at 3 p.m. The beer lasted until 10 p.m., and Araiza admitted that at that point, he and Chapo were intoxicated, but he was unsure whether Ibanez was intoxicated.

---

[1] Aside from Ibanez, Araiza could not provide the full names for the other men.

Araiza stated that Chapo then asked to borrow Araiza's truck to buy more beer, and Araiza told him "that the truck was there," with the keys in the truck, but that Chapo did not leave. Araiza was under the impression that Chapo was "going to send another person" to buy the beer for him since Chapo had been drinking beer. Araiza testified that he believed that Ibanez was the person that Chapo sent to the store because Ibanez was the only other person there. Araiza observed the truck leave, but he did not know who drove it. Araiza testified that only he, Chapo, Pepe, and Ibanez were at his residence at that time. When pressed by Graciela's lawyer at the deposition, Araiza testified that "maybe" Ibanez drove his truck that night.

In his deposition testimony, Araiza described Ibanez, who also failed to appear at trial but was represented by counsel, as "thin," "not too tall" and with a "little goatee." Araiza testified that Chapo had a mustache, but no beard. Araiza stated he did not discover that his truck had been involved in a wreck until the next morning, when the police arrived at his house. Araiza testified that he told the police that he had "loaned" out his truck to Chapo, but Chapo did not drive his truck that night. Araiza told the police that "maybe" Ibanez drove his truck that night "because he was the other one" that was at his house that night. Finally, Araiza testified that he has not spoken to Ibanez since the night of the accident, but he has spoken to Chapo, who told Araiza that he "doesn't know anything" about the accident.

At trial, Graciela introduced a recorded conversation between Araiza and Graciela's hired private investigator, Ricardo Tamez. Tamez testified that he was hired by Graciela's counsel to investigate the accident, and as part of his investigation, he made contact with Araiza. Tamez recorded his conversation with Araiza. The trial

4

court overruled Araiza and Ibanez's objections to the recording and admitted it into evidence. In the recording, Araiza admits to loaning out his truck that night, but he did not know to whom. Araiza admitted, however, that everyone at his house that night was drunk because they all started drinking beer at one o'clock that afternoon. Araiza confirmed that Chapo and Ibanez went to the store that night. On the recording, Araiza stated that Ibanez sported a "small beard" while Chapo had a mustache.

The jury found both Ibanez and Araiza liable and awarded Graciela $366,600 in past and future damages, and pre- and post-judgment interest. The trial court entered judgment on October 4, 2012. Ibanez and Araiza filed a joint motion for new trial that was overruled by operation of law. This appeal followed.

## II.   ADMISSIBILITY OF AUDIO RECORDING

By their first issue, Ibanez and Araiza contend that the trial court reversibly erred by admitting the audio recording of Tamez and Araiza's conversation (Plaintiff's Exhibit 120) over their objections that the recording was improperly authenticated and that it amounted to hearsay.[2]

### A.   Standard of Review

Evidentiary rulings are committed to the trial court's sound discretion. *Bay Area Healthcare Group, Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007). The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles. *E.I. du Pont de Nemours and Co., Inc. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995). Even if a trial court errs by improperly admitting evidence, to find

---

[2] Appellants also asserted that the recording's probative value was outweighed by its unfairly prejudicial effect; however, this argument was inadequately briefed. *See* TEX. R. APP. P. 38.1(i) ("[Appellant's] brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."). As a result, we decline to address this argument. *See* TEX. R. APP. P. 47.1.

reversible error, this Court must find that the district court's errors probably caused the rendition of an improper judgment or prevented a party from properly presenting their case. *See* TEX. R. APP. P. 44.1; *see also Bay Area Healthcare*, 239 S.W.3d at 234.

**B.    Discussion**

We turn first to appellants' argument that the audio recording was improperly authenticated because Tamez's purported "threats and intimidation" in obtaining Araiza's statements made them unreliable. Authentication or identification is a condition precedent to admissibility of evidence. *See* TEX. R. EVID. 901(a). One method of authentication or identification is through testimony of a witness with knowledge that the matter is what it is claimed to be. *See* TEX. R. EVID. 901(b)(1). In this case, Tamez testified that he recorded his conversation with Araiza and that Plaintiff's Exhibit 120 was a "true and correct and accurate copy" of the recorded conversation that he had with Araiza. We conclude that such testimony was sufficient under rule of evidence 901(b)(1) to properly authenticate the recording. *See id.*; *see also generally Jones v. State*, 80 S.W.3d 686, 689 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (concluding that a confidential informant's identification of the voices on the recording was sufficient for authentication purposes).

Furthermore, appellants' arguments that Tamez's purported threats and intimidation tactics toward Araiza made Araiza's statements unreliable are not supported by the record. Plaintiff's Exhibit 120 reveals that Tamez told Araiza that "the criminal case does not interest us that much." When asked during cross-examination why he mentioned the "criminal case" to Araiza, Tamez replied with the following:

> The reason that I mentioned that it wasn't a criminal [case] is because—I
> never said I had to, because a lot of times when you deal with people that

6

are from Mexico, they believe that an accident, like in Mexico, is a criminal act here, and it's not, and that was my point to mention it to him.

Additionally, Tamez, who is not a law-enforcement officer, testified that he "absolutely" did not intimidate Araiza during the conversation. Tamez stated that when he met with Araiza, he wore plain clothes, did not carry a firearm, and he wore a badge that said "private investigator." Tamez asserted that he did not pretend to be an officer that day and that Araiza never indicated to Tamez that he believed him to be an officer, although Tamez did not tell Araiza that he worked for Graciela. Araiza did not refute Tamez's testimony by presenting any testimony to the contrary regarding the alleged intimidation or threats. Accordingly, based on this record, we conclude that the trial court did not abuse its discretion by admitting Plaintiff's Exhibit 120 over objections that it was unauthenticated.

Next, we turn to appellants' argument that the audio recording amounts to inadmissible hearsay. "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. TEX. R. EVID. 801(d). A statement is not hearsay if the statement is offered against a party and is the party's own statement in an individual capacity. *Id.* 801(e)(2). Here, the recorded statements were made directly by Araiza during his conversations with Tamez. Accordingly, the trial court did not abuse its discretion by admitting Plaintiff's Exhibit 120 over the appellants' hearsay objections.

We overrule appellants' first issue.

### III.    LEGAL AND FACTUAL SUFFICIENCY CHALLENGES

By their second issue and third issues, appellants assert that the evidence is legally and factually insufficient to support the verdict that (1) Araiza entrusted his vehicle

7

to a negligent driver; and (2) Ibanez was the negligent driver.

### A. Standard of Review

When an appellant attacks the legal sufficiency of an adverse finding on an issue for which he did not have the burden of proof, the appellant must demonstrate that there is no evidence to support the adverse finding. *Editorial Caballero, S.A. de C.V. v. Playboy Enters., Inc.*, 359 S.W.3d 318, 328 (Tex. App.—Corpus Christi 2012, pet. denied) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005)). A no-evidence challenge will be sustained only if: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *City of Keller*, 168 S.W.3d at 810; *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 770 (Tex. 2010). We must view the evidence in the light most favorable to the verdict and "must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id.* (citing *City of Keller*, 168 S.W.3d at 822–27).

In reviewing a factual-sufficiency challenge to a jury finding on an issue on which the appellant did not have the burden of proof, we consider and weigh all of the evidence and set aside the verdict only if the evidence that supports the jury finding is so weak as to make the verdict clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175,

176 (Tex. 1986). We must examine both the evidence supporting and that contrary to the judgment. *Editorial Caballero*, 359 S.W.3d at 329. Additionally, the jury is the sole judge of the witnesses' credibility, and it may choose to believe one witness over another, and we may not impose our own opinion to the contrary. *Id.* (citing *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003)).

## B. Discussion

### 1. Araiza's Entrustment

To establish liability under a theory of negligent entrustment, Graciela must show that (1) Araiza entrusted the vehicle to Ibanez; (2) Ibanez was an unlicensed, incompetent, or reckless driver; (3) at the time of the entrustment, Araiza knew or should have known that Ibanez was an unlicensed, incompetent, or reckless driver; (4) Ibanez was negligent on the occasion in question; and (5) Ibanez's negligence proximately caused the accident. *See Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 758 (Tex. 2007). Araiza specifically challenges the first element of the negligent entrustment cause of action—i.e., that Araiza entrusted his vehicle to Ibanez. Entrustment may be shown by express or implied permission to drive the vehicle in question. *See Jamar v. Patterson*, 910 S.W.2d 118, 121 (Tex. App.—Houston [14th Dist.] 1995, writ denied). "Express permission is that which is affirmatively stated, while implied permission may be inferred from conduct between the parties in which there is acquiescence or lack of objection signifying consent." *Id.* (citing *Royal Indem. Co. v. H.E. Abbott & Sons, Inc.*, 399 S.W.2d 343, 345 (Tex. 1966)).

In this case, the evidence reveals that Araiza and others, including Ibanez, spent the afternoon of January 31, 2009 drinking three 24-packs of beer. Araiza testified that

9

he had a prior business relationship with Ibanez, but did not know him well. Once the beer ran out that evening, Chapo asked to borrow Araiza's truck in order to buy more beer at the drive-thru convenience store one-half mile away. Araiza consented and told Chapo that the keys were in the truck. Araiza testified, however, that Chapo did not drive his truck. Araiza testified in his deposition that he did not give Ibanez permission to drive his truck that night. However, during the interview with Tamez, Araiza testified that "some boys, some men," including Ibanez, asked Araiza to borrow his truck to buy more beer. Furthermore, in the interview, Araiza stated the following:

> [TAMEZ]: That—that—that man who drove your truck, you say you don't know him?
>
> ARAIZA: No.
>
> [TAMEZ]: Was he a friend of your nephew[']s?
>
> ARAIZA: My cousin[']s.
>
> [TAMEZ]: What were their names?
>
> . . . .
>
> ARAIZA: Rufino Ibanez because he was investigating. The police officer told me to get information, the State officer. And that's when I found that was his name and that's it.

Later in the interview, Tamez pressed Araiza further and asked him whether Ibanez was drunk before he left for the store, and Araiza replied, "Yes." In turn, Tamez asked, "You lent them the truck although they were drinking?" And Araiza replied, "Yes, because we were all—we were all sitting there." Finally, Araiza told Tamez that he thought that he was at fault because he lent out his truck. Again, Tamez asked Araiza whether he had lent his truck out with permission, and Araiza replied, "Yes."

10

Appellants argue that the record shows that Araiza had a very limited relationship with Ibanez, that he did not give his permission to Ibanez to drive his truck, and that these facts conclusively establish that Araiza did not entrust Ibanez with the vehicle. We disagree. The record shows that Ibanez knew Araiza prior to January 31, 2009 because he helped Araiza move bales of hay. Furthermore, the record shows that despite this purportedly "limited relationship," Araiza invited Ibanez, among others, to his house for a cookout, where the men consumed a combined total of 72 beers over a seven to nine-hour period of time. When the beer ran out, Chapo suggested that the group buy more beer. Araiza told Chapo that the keys were in his truck, and granted Chapo permission to take his truck to buy more beer. At this point in the record, the evidence conflicts about the person that Araiza granted permission to take his truck to buy more beer. First, Araiza testified that he did not give Ibanez permission to drive his truck, but that he instead gave permission to Chapo. That testimony contradicts Araiza's recorded statements to Tamez, in which Araiza says that he gave permission to Ibanez[3] to drive his truck and that he knew that Ibanez was drunk.

Furthermore, we find no evidence to show that Araiza's conduct that night demonstrated a failure to acquiesce or a failure to consent to Ibanez driving his truck. The record indicates that Chapo did not drive Araiza's truck that night, but Araiza was aware that someone else drove his truck to buy more beer because he saw the truck leave, and he stated that of the four men present at the cookout that night, neither he, Pepe, nor Chapo drove the truck. Araiza then testified that "maybe" Ibanez was the one who drove the truck that night in search of more beer. Finally, Araiza admitted in

---

[3] Throughout the interview, Araiza does not identify Ibanez by name, but instead, as a "man . . . from Diaz Ordaz, [Mexico]."

11

Plaintiff's Exhibit 120 that he believed that he was at fault because he lent out his truck.

After viewing this evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not, we hold that the appellants failed to demonstrate that there is no evidence to support the jury's finding that Araiza entrusted his vehicle to Ibanez either by express or implied permission. *See City of Keller*, 168 S.W.3d at 810. Stated another way, we conclude that the evidence at trial is legally sufficient to enable reasonable and fair-minded people to reach the verdict under review. *See Del Lago Partners, Inc. v. Smith*, 307 S.W.3d at 770.

Likewise, after weighing all of the evidence supporting and that contrary to the judgment, we conclude that the evidence is not so weak as to make the verdict clearly wrong and manifestly unjust. *See Cain*, 709 S.W.2d at 176.

Appellants' second issue is overruled.

### 2. Ibanez As the Negligent Driver

Appellants also challenge the factual and legal sufficiency of the evidence to support the jury's finding that Ibanez was the negligent driver.

Neither Ibanez nor Araiza were present at trial, but both were represented by counsel. Graciela read various pre-trial written discovery responses by Ibanez and Araiza into the record. The first was an interrogatory to Ibanez, which asked him to state in detail how the collision in question occurred. Ibanez replied: "will supplement," but no supplement was provided. The next interrogatory to Ibanez asked, "If the vehicle driven by [Ibanez] was not owned by you, please state the vehicle owner's name, address and telephone number." Ibanez responded with Araiza's name and address.

12

Furthermore, Graciela propounded requests for disclosure to Araiza, which asked him to list "the name, address, and telephone number of persons having knowledge of relevant facts and a brief statement of each identified person's connection with the case." Araiza identified Ibanez as a person with knowledge of relevant facts and identified him as the "defendant/driver."

Additionally, Araiza's statements in Plaintiff's Exhibit 120 stated that Ibanez drove his truck along with Chapo. Araiza additionally testified in his deposition that of the four men present at the cookout that night—i.e., himself, Chapo, Pepe, and Ibanez—neither he, Chapo, nor Pepe drove the truck that night, and testified that "maybe" it was Ibanez. In his deposition, Araiza described Ibanez as a "thin" "dark skinned" individual with a "little goatee." Graciela testified that shortly after the accident, she witnessed the truck that collided with her vehicle drive away from the convenience store. Graciela described the driver of the truck as a "heavy set" man with a dark complexion and beard. While the two descriptions of Ibanez conflict, when reasonable jurors, as in this case, can resolve the evidence either way, we must presume that the jury did so in favor of the prevailing party and disregard the conflicting evidence in our review. *See City of Keller*, 168 S.W.3d at 820.

Therefore, after viewing this evidence in a light most favorable to the verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not, we hold that the appellants failed to demonstrate that there is no evidence to support the jury's finding that Ibanez was the negligent driver that proximately caused Graciela's damages. *See id.* at 810. In other words, the evidence at trial is legally sufficient to enable reasonable and fair-minded

13

people to reach the verdict under review. *See Del Lago Partners, Inc. v. Smith*, 307 S.W.3d at 770.

Similarly, after weighing all of the evidence supporting and that contrary to the judgment, we conclude that the evidence is not so weak to make the verdict clearly wrong and manifestly unjust. *See Cain*, 709 S.W.2d at 176.

Appellant's final issue is overruled.

## IV. CONCLUSION

We affirm the trial court's judgment.

_____
GINA M. BENAVIDES,
Justice

Delivered and filed the
24th day of April, 2014.